```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4     ALBERTO MALTA,                       .

 5          PLAINTIFF,                      . NO. 10-CV-1290
                                            .
 6               V.                         . JUNE 19, 2013
                                            .
 7     THE FEDERAL HOME LOAN MORTGAGE       . 9:05 A.M.
       CORPORATION, ET AL.,                 .
 8                                          . SAN DIEGO, CALIFORNIA
               DEFENDANT.                   .
 9     . . . . . . . . . . . . . . . .

10
                        TRANSCRIPT OF MOTION HEARING
11              BEFORE THE HONORABLE ROGER T. BENITEZ
                     UNITED STATES DISTRICT JUDGE
12
          APPEARANCES:
13
          FOR THE PLAINTIFF:      LAW OFFICES OF DOUGLAS J. CAMPION
14                                BY:  DOUGLAS J. CAMPION, ESQ.
                                  409 CAMINO DEL RIO SOUTH, STE. 303
15                                SAN DIEGO, CALIFORNIA  92108

16                                KAZEROUNI LAW GROUP, APC
                                  BY:  JOSHUA B. SWIGART, ESQ.
17                                BY:  ABBAS KAZEROUNIAN, ESQ.
                                  2700 NORTH MAIN STREET, STE. 1000
18                                SANTA ANA, CALIFORNIA  92705

19        FOR THE DEFENDANT:      SEVERSON & WERSON
                                  BY:  MARK D. LONERGAN, ESQ.
20                                ONE EMBARCADERO CENTER, 26TH FLOOR
                                  SAN FRANCISCO, CALIFORNIA  94111
21                                BY:  ERIC J. TROUTMAN, ESQ.
                                  BY:  SHANNON GAUSMAN, ESQ.
22                                19100 VON KARMAN AVENUE, STE. 700
                                  IRVINE, CALIFORNIA  92612
23
       COURT REPORTER:      DEBORAH M. O'CONNELL, RPR, RMR, CSR
24                          333 W. BROADWAY, ROOM 420
                            SAN DIEGO, CALIFORNIA, 92101
25
       REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER
```

```
 1        CONT'D.

 2        APPEARANCES:

 3        FOR THE OBJECTOR,        ATTORNEY AT LAW/MORTGAGE BROKER
          JULIUS DUNMORE:          BY:  JAMES C. WEAVER, ESQ.
 4                                 FOR: MICHAEL LUPPI, ESQ.
                                   7515 CABRILLO AVENUE
 5                                 LA JOLLA, CALIFORNIA  92037

 6                                 DEL MAR LAW GROUP, LLP
                                   BY:  DAVID P. HALL, ESQ.
 7                                 2002 JIMMY DURANTE BLVD., STE. 100
                                   DEL MAR, CALIFORNIA  92014
 8

 9        ALSO PRESENT:            ROSNER, BARRY & BABBITT, LLP
                                   BY:  GREGORY T. BABBITT, ESQ.
10                                 10085 CARROLL CANYON RD., STE. 100
                                   SAN DIEGO, CALIFORNIA  92131
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SAN DIEGO, CALIFORNIA, JUNE 19, 2013, 9:05 A.M.

2                                    * * * *

3

4          THE COURT:  GOOD MORNING.

5          THE CLERK:  ONE ON CALENDAR, CASE NO. 10-CV-1290,

6   MALTA VS. THE FEDERAL HOME LOAN MORTGAGE CORPORATION, ET AL.,

7   MOTION HEARING.

8          THE COURT:  IF YOU'D ALL DO ME A FAVOR AND REGISTER

9   YOUR APPEARANCES FOR THE RECORD.

10         MR. CAMPION:  GOOD MORNING, YOUR HONOR.  DOUGLAS

11  CAMPION, APPEARING ON BEHALF OF THE PLAINTIFFS.

12         MR. SWIGART:  AND JOSH SWIGART, ON BEHALF OF THE

13  PLAINTIFFS, YOUR HONOR.

14         MR. KAZEROUNIAN:  GOOD MORNING, YOUR HONOR.  ABBAS

15  KAZEROUNIAN, FOR THE PLAINTIFFS.

16         MR. LONERGAN:  GOOD MORNING, YOUR HONOR.  MARK

17  LONERGAN, FOR WELLS FARGO AND FEDERAL HOME LOAN MORTGAGE

18  CORPORATION.

19         MR. TROUTMAN:  GOOD MORNING, YOUR HONOR.  ERIC

20  TROUTMAN, FOR THE DEFENDANTS AS WELL.

21         THE COURT:  OKAY, GREAT.  WELL, THIS MORNING WE HAVE

22  ON CALENDAR THE MOTION FOR THE FINAL APPROVAL OF THE CLASS

23  ACTION SETTLEMENT.  I BELIEVE THERE HAD BEEN A PRELIMINARY

24  APPROVAL IN THIS MATTER.

25         AND LET'S SEE, ARE THERE ANY OBJECTORS HERE TODAY?

1          MR. WEAVER:  YES, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  IF YOU'D PLEASE COME FORWARD

3   AND IDENTIFY YOURSELF.

4          MR. WEAVER:  MY NAME IS JIM WEAVER.  I'M AN ATTORNEY.

5   I'M APPEARING SPECIALLY FOR MICHAEL LUPPI, WHO IS THE ATTORNEY

6   FOR JULIUS DUNMORE, AN OBJECTOR.

7          THE COURT:  MICHAEL LUPPI?

8          MR. WEAVER:  YES.  HE SHOULD BE THE ATTORNEY OF

9   RECORD, YOUR HONOR.

10         THE COURT:  OKAY.

11         MR. WEAVER:  THANK YOU.

12         THE COURT:  AND HE IS ATTORNEY OF RECORD FOR -- WHO

13  DID YOU SAY?

14         MR. WEAVER:  DUNMORE, JULIUS DUNMORE.

15         THE COURT:  ALL RIGHT.  SIR?

16         MR. HALL:  GOOD MORNING, YOUR HONOR.  DAVID HALL, I

17  WAS ALSO APPEARING FOR THE OBJECTOR, JULIUS DUNMORE AS WELL.

18         THE COURT:  WELL, LET'S SEE, MY TASK TODAY IS TO

19  BASICALLY DECIDE WHETHER OR NOT THE SETTLEMENT IS FAIR,

20  REASONABLE, AND ADEQUATE.  NOW I HAVE REVIEWED THE OBJECTIONS

21  THAT HAVE BEEN FILED.

22      WAS THERE ANYTHING THAT EITHER ONE OF YOU WANTED TO ADD IN

23  CONNECTION WITH THE OBJECTIONS THAT HAVE BEEN FILED?

24         MR. WEAVER:  JIM WEAVER, AGAIN, YOUR HONOR, FOR

25  JULIUS DUNMORE.  THE COURT HAS READ THE OBJECTION.  AND I WANT

1   TO REITERATE THAT THE NOTICE FAILS TO INFORM THE CLASS MEMBERS

2   OF THE SIZE OF THE CLASS.  SO IT'S IMPOSSIBLE TO EVALUATE

3   WHETHER THE PROPOSED $17.1 MILLION IS FAIR AND ADEQUATE, AND

4   CONTRAST WITH THE $500 TELEPHONE CONSUMER PROTECTION ACT

5   VIOLATION, WHICH IS IMPOSED SHOULD YOU PROVE THAT VIOLATION.

6   BUT THAT'S ALL IN OUR OBJECTION, YOUR HONOR.

7          THE COURT:  SO I TAKE IT, THEN, YOU'RE WITHDRAWING

8   THE OBJECTION ABOUT THE ATTORNEYS' FEES, RIGHT?

9          MR. WEAVER:  NO.  THAT IS IN THE PLEADINGS.  IF

10  THAT'S IN THE OBJECTION, THAT'S STILL PROPOSED.  THAT'S STILL

11  OUR OBJECTION.  I'M JUST ADDING THIS TO THE COURT AT THIS TIME.

12         THE COURT:  OKAY.  ALL RIGHT.

13     SIR?

14         MR. HALL:  YES, YOUR HONOR.  THANK YOU.  DAVID HALL,

15  AGAIN APPEARING FOR JULIUS DUNMORE.  AS FAR AS THE --

16         THE COURT:  LET ME ASK YOU A QUESTION.  WHY ARE THERE

17  TWO OF YOU?

18         MR. HALL:  YOUR HONOR, I WAS CONTACTED YESTERDAY

19  AFTERNOON BY MR. DUNMORE'S COUNSEL IN FLORIDA TO APPEAR AT THIS

20  HEARING.

21         THE COURT:  IS THIS THE SAME MICHAEL LUPPI?

22         MR. WEAVER:  HE'S CALIFORNIA COUNSEL, YOUR HONOR.

23         THE COURT:  HE'S CALIFORNIA COUNSEL?

24         MR. WEAVER:  YES.

25         MR. HALL:  AND I WAS ASKED TO APPEAR.  I FILED MY

1   NOTICE OF ASSOCIATION OF COUNSEL THIS MORNING.

2           THE COURT:  I SEE.  OKAY.  SO THE DUNMORES HAVE A

3   CALIFORNIA LAWYER, A FLORIDA LAWYER?

4           MR. HALL:  YES.

5           THE COURT:  THE CALIFORNIA LAWYER CONTACTED YOU, AND

6   THE FLORIDA LAWYER CONTACTED YOU?

7           MR. HALL:  APPARENTLY THE LEFT HAND DIDN'T KNOW WHAT

8   THE RIGHT HAND WAS DOING IN THIS CASE, YOUR HONOR.

9           THE COURT:  IT SOUNDS THAT WAY.  THEY MUST HAVE A LOT

10  OF MONEY TO SPEND ON FILING THESE OBJECTIONS.

11      SO WHAT IS YOUR TAKE?

12          MR. HALL:  YOUR HONOR, I WANTED TO ADDRESS TWO POINTS

13  PRIMARILY.  THE FIRST ISSUE WAS ON THE ATTORNEYS' FEES AND THE

14  REASONABLENESS OF THE ATTORNEYS' FEES.  THE PROPOSED ATTORNEYS'

15  FEES THAT WERE OFFERED WERE, AS THE RECORD SHOWS, WAS 22 AND A

16  HALF PERCENT OF THE $17 MILLION SETTLEMENT FUND.  HOWEVER, WHAT

17  WAS PUT IN THE PAPERS ALSO SHOWS THAT APPROXIMATELY $3 MILLION

18  OF THE SETTLEMENT FUND CAME OUT OF THAT AND WAS TAKEN AWAY FROM

19  THE CLASS MEMBERS TO PAY FOR THE COST AND NOTICE GIVEN TO ALL

20  OF THE CLASS MEMBERS.  NOW NORMALLY, THE COST ASSOCIATED WITH

21  NOTICE SHOULD BE BORNE BY THE PLAINTIFF UNLESS THERE IS AN

22  ORDER FROM A COURT CHANGING THAT.

23      IN THIS PARTICULAR INSTANCE, I DID NOT SEE ANY SUCH ORDER

24  FROM THE COURT AUTHORIZING ANOTHER PARTY TO PAY FOR THE COSTS

25  ASSOCIATED WITH THAT.  IT LOOKS LIKE IN THIS PARTICULAR

1  INSTANCE, THE PLAINTIFF NEGOTIATED PART OF THE SETTLEMENT TO

2  HAVE THE COST MONEY SPECIFICALLY WITHDRAWN FROM THE SETTLEMENT

3  TO PAY FOR THE NOTICE.

4      WHEN YOU DEDUCT THE -- I BELIEVE IT WAS $2,927,000 FROM

5  THAT, THE ACTUAL SETTLEMENT VALUE, THE NET SETTLEMENT VALUE OF

6  THAT WHICH IS TO BE DISTRIBUTED TO THE CLASS MEMBERS IS ABOUT

7  14.173 MILLION.  IF YOU WERE TO USE A PERCENTAGE BASED ON

8  WHAT -- THE NUMBER THEY'RE PROPOSING, 3.8 MILLION, THAT IS

9  ACTUALLY A 27.14 PERCENT ATTORNEYS' FEES ON THE NET SETTLEMENT.

10      IN ACTUALITY, IF YOU DO A 22.5 PERCENT FROM THE NET

11  REMAINING SETTLEMENT, IT IS ACTUALLY -- THE ATTORNEYS' FEES ARE

12  ABOUT 3.188.  THE OTHER THING I NOTICED IN THE PAPERS THAT WERE

13  FILED IS COUNSEL IS KIND ENOUGH TO INCLUDE THEIR BILLING

14  RECORDS, AND I BELIEVE THE TOTAL SUM OF THE BILLED ATTORNEYS'

15  FEES UNDER THE LODESTAR THAT THEY WOULD BE SEEKING WAS PREMISED

16  ON ABOUT $750,000, GIVE OR TAKE, AND THEN THEY'RE ASKING FOR

17  OVER A FIVE-TIMES MULTIPLIER OF THAT, WHICH IF YOU MULTIPLY

18  THAT BY THEIR HOURLY RATE, MR. CAMPION IS BILLING IN EXCESS OF

19  $3,000; MR. SWIGART WOULD BE ABOUT $2,700 AN HOUR FOR THIS

20  TIME, WHICH FAR EXCEEDS WHAT WOULD BE THE FAIR MARKET VALUE IN

21  THIS MARKET.

22      THE ATTORNEYS' FEES IN THE CASES THAT THEY CITED

23  SPECIFICALLY, THE KAYANO CASE, AT 290 F 3D. 143 DID ALLOW AN

24  INCREASED MULTIPLIER, BUT THAT WAS A CASE INVOLVING 11 YEARS OF

25  LITIGATION, MULTIPLE APPEALS, MULTIPLE MOTIONS, AND WAS HEAVILY

1    LITIGATED.

2        THE SAME IN THE CRAFT VS. COUNTY OF SAN BERNARDINO CASE,

3    WHICH IS CITED IN THEIR OPPOSITION TO THE ATTORNEYS' FEES

4    MOTION, AGAIN DEALT WITH A CASE THAT WAS HEAVILY LITIGATED.

5    WHEN I LOOK BACK AT THE RECORD AND THE DOCKET, AS WELL AS THE

6    ATTORNEYS' FEES, ONE OF THE THINGS I SAW WHEN I WAS GOING

7    THROUGH THESE BILLS WAS THERE WAS REALLY NOT THAT MUCH BILLED

8    AS FAR AS WHAT WAS ON THE MERITS.  THERE WAS NO 12(B)(6)

9    MOTION.  THERE WERE NO MOTIONS FOR SUMMARY JUDGMENT PENDING.

10   AND, IN FACT, A LOT OF THE BILLS THAT WERE ATTACHED, WHAT I

11   SAW, I DIDN'T SEE ANY DEPOSITIONS THAT WERE TAKEN.  THERE WERE

12   A FEW ENTRIES.

13       I BELIEVE ONE COUNSEL BILLED HAD FOUR ENTRIES RELATED TO

14   DISCOVERY.  MR. CAMPION, I BELIEVE, HAD A FEW ENTRIES AS WELL.

15   MR. SWIGART'S BILLS DID SHOW SOME MORE DISCOVERY.  BUT WHEN YOU

16   LOOK AT THE AMOUNT OF WORK OF WHAT THEY DID, AND YOU LOOK AT

17   WHAT THE BILLS SHOW, FROM WHAT I CAN TELL, THERE REALLY -- WHAT

18   I SAW, A LOT OF DISPUTE, HEAVILY LITIGATED CASE THAT WOULD HAVE

19   BEEN FOUND IN THIS VIZCAINO CASE.

20       I ALSO WANTED TO TALK ABOUT THE FAIRNESS OF THE CLASS

21   ACTION, YOUR HONOR.  ONE OF THE THINGS WHEN I READ THE COURT'S

22   TENTATIVE RULING, WAS THE COURT RELIED HEAVILY ON A DECLARATION

23   CONCERNING WHAT TYPE OF INVESTIGATION HAD BEEN DONE,

24   SPECIFICALLY THE DECLARATION OF ERIC TROUTMAN, WHICH I BELIEVE

25   WAS DOCUMENT 42.  AND IN THIS DECLARATION -- I BELIEVE THE

1    COURT REFERENCED IT -- HE IS INFORMED AND BELIEVED WELLS FARGO

2    EXPENDED OVER A THOUSAND MAN HOURS IN ITS EFFORT TO CONDUCT A

3    SAMPLING OF THE ACCOUNTS.  THEY ALSO INDICATE IN PARAGRAPH 9

4    THAT THEY -- 8 AND 9, THAT THEY CONDUCTED A REVIEW OF A

5    SAMPLING OF THESE RECORDS.

6         WHEN I LOOKED AT ALL OF THE PAPERS, YOUR HONOR, I REALLY

7    DIDN'T SEE ANYTHING IN THERE WHICH SUGGESTED WHAT TYPE OF

8    SAMPLING WAS DONE.  AND, IN FACT, AT DOCUMENT 25, IN THE JOINT

9    MOTION TO EXTEND TIME, AT PARAGRAPH 9, THE DISCOVERY PLAN THAT

10   WAS CONTEMPLATED WAS THAT THEY WOULD ACTUALLY REVIEW 400 FILES

11   BY HAND.  IF THAT WAS DONE, YOU WERE LOOKING AT A CLASS SIZE OF

12   IN EXCESS OF 5 MILLION PERFORMING A RANDOM SAMPLE ON 400 CLAIMS

13   IN DETERMINING WHETHER OR NOT PRIOR EXPRESS CONSENT WAS GIVEN.

14        THERE IS NO EVIDENCE SHOWING THAT WAS A STATISTICALLY

15   SIGNIFICANT SAMPLING FOR THEM TO BE ABLE TO DRAW CONCLUSIONS

16   BASED UPON WHETHER OR NOT THIS WAS AN APPROPRIATE SETTLEMENT.

17   MOREOVER, I ALSO NOTICED, YOUR HONOR, IN READING THE PAPERS,

18   THERE WAS A LOT OF GENERALITY CONCERNING THE MERITS, WHICH IN

19   ASSESSING THE CLASS ACTION FAIRNESS, ONE OF THE THINGS WE HAVE

20   TO LOOK AT IS THE STRENGTH OF THE PLAINTIFF'S CASE.

21        IT WOULD SEEM TO ME THAT THE FIRST PEOPLE THAT SHOULD HAVE

22   BEEN REVIEWED TO DETERMINE WHETHER OR NOT PRIOR EXPRESS CONSENT

23   HAD BEEN GIVEN WAS THE PLAINTIFF.  I NEVER SAW ANYTHING IN THE

24   RECORD TO SUGGEST --

25             THE COURT:  WAIT.  YOU WERE JUST -- DIDN'T YOU JUST

1   TELL ME YOU WERE RETAINED ON THIS LAST NIGHT?

2          MR. HALL:  YES.

3          THE COURT:  WOW, I'M IMPRESSED.  OKAY.

4          MR. HALL:  THIS WAS WHY -- FRANKLY, YOUR HONOR, THIS

5   IS WHY THE NOTICE OF ASSOCIATION WAS NOT FILED UNTIL THIS

6   MORNING.  I WAS UP RATHER LATE LAST NIGHT REVIEWING SOME

7   THINGS.

8          THE COURT:  OKAY.

9          MR. HALL:  THE MERITS OF THE CLAIM -- AND AGAIN, AS

10  THE COURT NOTIFIED IN ITS PRELIMINARY ORDER, TALKED ABOUT THE

11  UNCERTAINTY OF WHAT PRIOR EXPRESS CONSENT IS GIVEN.  WHILE I

12  AGREE TO A POINT, PRIOR EXPRESS CONSENT IS STILL IN SOMEWHAT OF

13  A STATE OF FLUX.  IT APPEARS THE NINTH CIRCUIT IS STARTING TO

14  FOLLOW WHAT THE FCC DID IN ITS INTERPRETATIONS.  FOR EXAMPLE,

15  WE HAVE THE SLATTERFIELD OPINION, WHICH TALKS ABOUT AND

16  INCORPORATES WHAT AN AUTO DIALER WAS.  YOU HAVE THE MEYER

17  OPINION, WHICH TALKS ABOUT WHAT PRIOR EXPRESS CONSENT MEANS.

18  IT IS CONSENT TO CALL A PARTICULAR TELEPHONE NUMBER IN

19  CONNECTION WITH A PARTICULAR --

20         THE COURT:  COUNSEL, HAVE YOU REPRESENTED THESE

21  OBJECTORS BEFORE?

22         MR. HALL:  NO, I HAVE NOT.

23         THE COURT:  DO YOU KNOW IF THEY FILED OBJECTIONS IN

24  ANY OTHER CASES?

25         MR. HALL:  I DO NOT.

1          THE COURT:  ALL RIGHT.

2          MR. HALL:  SO THE FCC RULING APPEARED TO BE --

3     STARTING TO BE ADOPTED BY THE NINTH CIRCUIT AS WHAT PRIOR

4     EXPRESS CONSENT IS.  THE DECLARATIONS OF MR. TROUTMAN, AGAIN,

5     DOCUMENT 42, AGAIN PARAGRAPH 9 STATES, HE'S INFORMED AND

6     BELIEVED THAT WELLS FARGO WAS ABLE TO DETERMINE WITH REGARD TO

7     SOME FORM OF EXPRESS CONSENT WAS GIVEN EITHER BECAUSE THE

8     NUMBER WAS PROVIDED AT THE TIME OF APPLICATION, OR CONSENT WAS

9     PRESUMED TO BE CARRIED OVER.

10         WHAT I DID NOT SEE WHEN I REVIEWED THE FILINGS, YOUR

11    HONOR, IS WHETHER OR NOT THE PLAINTIFF IN THIS CASE EVEN HAD

12    STANDING, WHETHER OR NOT THEY ACTUALLY VIOLATED THE ACT WHEN

13    THE CALL WAS ALLEGEDLY MADE.  WAS HE PART OF THE PEOPLE WHO

14    SUBMITTED AN ORIGINAL APPLICATION?  HOW DID THEY GET HIS

15    TELEPHONE NUMBER?  DID THEY PERFORM SOME SORT OF TRACING?  DID

16    THEY PERFORM SOME SORT OF SEARCH?

17         THE COURT:  LET ME SEE IF I UNDERSTAND.  YOU'RE

18    SAYING YOU DON'T THINK THE PLAINTIFFS MAY HAVE STANDING IN THIS

19    CASE?

20         MR. HALL:  NO, YOUR HONOR.  WHAT I'M SUGGESTING IS

21    WHEN THE COURT LOOKS AT THE STRENGTH OF THE PLAINTIFF'S CASE --

22         THE COURT:  YEAH.

23         MR. HALL:  -- THERE IS A LOT OF GENERALITY THAT IS

24    GIVEN IN THE FILINGS ABOUT HOW THE PLAINTIFF BELIEVES THE CASE

25    HAS MERIT.  AND THE DEFENSE SAYS, WE BELIEVE WE HAVE STRONG

EXPRESS CONSENT DEFENSES TO ALL OF THESE.  THOSE ARE THE
GENERALITIES THAT ARE PROVIDED TO THE COURT.  IN ASSESSING THE
FINAL FAIRNESS AND WHETHER OR NOT THE SETTLEMENT IS REASONABLE,
WE HAVE TO LOOK AT THE STRENGTH OF THE PLAINTIFF'S CASE AS ONE
OF THE FACTORS.

      THE COURT:  YES.  THAT IS TRUE.

      MR. HALL:  AND WHEN LOOKING AT THE STRENGTH OF THE
PLAINTIFF'S CASE, NEITHER SIDE PROVIDED YOU ANY SUFFICIENT
EVIDENCE OTHER THAN THE REPRESENTATIONS OF COUNSEL, AS TO
WHETHER OR NOT -- THE THRESHOLD QUESTION, WHETHER OR NOT THE
PLAINTIFF EVEN HAD A RIGHT TO BRING THE CASE OR NOT.
MOREOVER --

      THE COURT:  YOU THINK THAT THE DEFENDANTS WOULD BE
WILLING TO PAY $17 MILLION IF THEY DIDN'T THINK THERE WAS
STRENGTH TO THE PLAINTIFF'S CASE?

      MR. HALL:  THERE MAY -- THERE MIGHT HAVE BEEN, YOUR
HONOR.  BUT I CAN TELL YOU, HAVING HANDLED A TCPA CASE, THE
POTENTIAL LIABILITY ON THIS STATUTE IS, IN A WORD, DEVASTATING.
THE COST BENEFIT IN OBTAINING A RELEASE OF $5.5 MILLION --
APPROXIMATELY 5.5 MILLION CLASS REPRESENTATIVES AND HAVING
THEIR CLAIMS WIPED OUT, COMPARED TO THE PAYMENT OF
$19.1 MILLION, WHEN POTENTIALLY FACING HUNDREDS OF MILLIONS OF
DOLLARS IN POTENTIAL DAMAGES, IT MAY HAVE COME DOWN TO A
BUSINESS DECISION.

      THE COURT:  DON'T THEY USUALLY COME DOWN TO A

1    BUSINESS DECISION?  ISN'T THAT WHAT ALWAYS HAPPENS?

2         MR. HALL:  ABSOLUTELY.  I AGREE.  IT NORMALLY DOES.

3    AND IN MY HUMBLE OPINION, IT'S ONE OF THE FLAWS OF TCPA.  BUT

4    SINCE I'M NOT IN CONGRESS, I'M NOT REALLY -- WE HAVE TO ACCEPT

5    THE STATUTE AS IS.

6         THE COURT:  OKAY.

7         MR. HALL:  BUT THE PROBLEM I HAVE IS, WHEN YOU'RE

8    EVALUATING THE CASE, WHAT EVIDENCE DO YOU HAVE IN FRONT OF YOU

9    THAT SAYS THERE IS SOME MERIT TO IT?  YOU HAVE REPRESENTATION

10   OF COUNSEL SAYING THERE IS; YOU HAVE A REPRESENTATION OF

11   COUNSEL SAYING, WE BELIEVE WE HAVE PRIOR EXPRESS CONSENT.

12        THE COURT:  WHAT DO YOU THINK I SHOULD HAVE?

13        MR. HALL:  THERE SHOULD BE SOME DECLARATION, SOME

14   EXHIBIT SAYING, HERE IS HOW THEY GOT MY TELEPHONE NUMBER.  DID

15   THEY INCLUDE IT IN AN APPLICATION FOR A LOAN?  DID THE

16   DEFENDANT AND THE PLAINTIFF, WHO HAD BEEN WORKING TOGETHER TO

17   PERFORM A DISCOVERY PROTOCOL, AS REFERENCED IN THE PLEADINGS,

18   HAD COME FORWARD WITH A DECLARATION SIGNED BY SOMEBODY THAT

19   SAID, HERE WAS THE BILL, OR HERE WAS THE ORIGINAL STATEMENT --

20        THE COURT:  LET ME ASK YOU A QUESTION.  THIS HAS

21   ALWAYS TROUBLED ME ABOUT THESE TYPES OF CASES.

22      SO IN ESSENCE, AS I HEAR WHAT YOU'RE SAYING, THE PLAINTIFF

23   HAS TO PROVIDE SUFFICIENT INFORMATION TO SHOW THAT THEY HAVE A

24   STRONG CASE, RIGHT?

25        MR. HALL:  I WOULD NOT NECESSARILY SAY A "STRONG

1    CASE," YOUR HONOR, BUT A CASE.

2              THE COURT:  A CASE.

3           MR. HALL:  RIGHT.

4              THE COURT:  AND THE FACT THAT THEY HAVE LAWYERS

5    REPRESENTING THEM WHO ARE WILLING TO SAY THAT THEY THINK THEY

6    HAVE A CASE, AND THE FACT THAT YOU HAVE A DEFENDANT WHO IS

7    SAYING, HEY, WE'RE WILLING TO PAY MONEY TO SETTLE THIS CASE, I

8    MEAN, TO ME THAT SEEMS TO BE PRIMA FACIA SHOWING OF THE FACT

9    THAT THERE IS A CASE.

10       NOW, THE PROBLEM YOU ALWAYS RUN INTO IS:  THAT THE MORE

11   THAT IS SHOWN IN THE PROCESS, THE STRONGER OR WEAKER THE ONE

12   SIDE OF ONE CASE GETS.  AND THE STRONGER AND WEAKER THE ONE

13   SIDE GETS, THE LESS LIKELIHOOD THERE IS OF A SETTLEMENT.

14       SO IN OTHER WORDS, IF THE PLAINTIFFS -- YOU KNOW, THE

15   PLAINTIFFS GET TO FEEL THAT THEY REALLY, REALLY, REALLY HAVE A

16   REALLY, REALLY STRONG CASE, AND THE DEFENSE HAS A VERY WEAK

17   DEFENSE, THERE IS NO REASON TO SETTLE, IS THERE.

18       ON THE OTHER HAND, IF THE PLAINTIFF SHOWS THE DEFENSE THAT

19   MAYBE THEY HAVE NOT SUCH A STRONG CASE AFTER ALL, WHY IS THE

20   DEFENSE GOING TO PAY $17 MILLION?  THEY WOULD SAY NO, WE'LL

21   FILE A 12(B)(6) MOTION OR RULE 56 MOTION OR WHATEVER, AND THEN

22   THERE IS NO SETTLEMENT, AND THE CLASS MEMBERS GET ZIP.

23       SO THERE IS ALWAYS THIS -- THEY ARE SORT OF PLAYING THEIR

24   CARDS KIND OF CLOSE TO THE VEST.  THEY HAVE TO REVEAL

25   SOMETHING, BUT THEY DON'T WANT TO REVEAL EVERYTHING.  AND SO IN

1    MY EXPERIENCE IN CLASS SETTLEMENTS, THE -- YOU KNOW, WE RELY ON

2    THE LAWYERS TO REPRESENT BOTH SIDES, YOU KNOW, THEIR CLIENTS.

3    SO THAT DOESN'T SEEM SO UNUSUAL TO ME.  IF THE DEFENSE DOESN'T

4    THINK THERE IS STRENGTH IN THE PLAINTIFF'S CASE, THEY'RE

5    CERTAINLY GOING TO MAKE THAT KNOWN.

6         ON THE OTHER HAND, IF THE PLAINTIFFS THINK THERE IS NO

7    DEFENSE, THEY'RE GOING TO MAKE THAT KNOWN AS WELL.  AND THAT'S

8    HOW YOU ARRIVE AT A SETTLEMENT.  I DON'T KNOW HOW MANY

9    SETTLEMENT CONFERENCES I'VE CONDUCTED OVER THE YEARS, BUT QUITE

10   A FEW.  SO WHAT ELSE -- I MEAN, I'M MISSING YOUR POINT.  I'M

11   SORRY, I APOLOGIZE.  BUT APPARENTLY YOU WANT -- YOU WANT MORE.

12   YOU KNOW, YOU WANT MORE, MORE, MORE EVIDENCE, IF YOU WILL.  BUT

13   THE MORE EVIDENCE THAT IS PRODUCED, THE LESS LIKELY IT IS THAT

14   THE PARTIES ARE GOING TO SETTLE IT SEEMS TO ME.

15            MR. HALL:  AND THAT MAY VERY WELL BE THE FACTS, YOUR

16   HONOR, EXCEPT WHEN YOU LOOK AT THIS PARTICULAR STATUTE.  THIS

17   PARTICULAR STATUTE, IF FOUND LIABLE, AWARDS $500 PER TELEPHONE

18   CALL.  NOT -- SO ALL YOU NEED IS A VERY MINOR NUMBER OF PEOPLE

19   TO HAVE RECEIVED TELEPHONE CALLS WITHOUT PRIOR EXPRESS CONSENT

20   BEFORE THE NUMBERS BEGIN GROWING EXPONENTIALLY.  FROM PART OF A

21   BUSINESS DECISION, IT MAKES SENSE TO SETTLE THESE CASES BECAUSE

22   THE WAY MY UNDERSTANDING IS, ESPECIALLY IN LIGHT OF THE BATEMAN

23   DECISION THAT CAME DOWN, AND WHEN YOU HAVE THE -- I WANT TO SAY

24   SOME DISPUTE BETWEEN BATEMAN AND THE PREVIOUS CLIENT DECISION

25   CONCERNING CLASS ACTION CERTIFICATION OF THESE TYPES OF CLAIMS.

1      THE TCPA, YOUR HONOR, IF I CAN DO IT THIS WAY, IS A

2  DIFFICULT CLAIM, IN MY VIEW OF THE LAW, TO GET CERTIFIED AS A

3  CLASS.

4           THE COURT:  WELL, WE'RE BEYOND THAT.

5           MR. HALL:  I UNDERSTAND.

6           THE COURT:  WHERE WAS YOUR CLIENT WHEN WE STARTED

7  DOWN THIS ROAD?

8           MR. HALL:  I'M SORRY?

9           THE COURT:  WHERE WAS YOUR CLIENT WHEN WE STARTED

10  DOWN THIS ROAD?  WHY DID THEY NOT OBJECT TO CERTIFICATION OF

11  THE CLASS?

12           MR. HALL:  YOUR HONOR, FRANKLY, I'M NOT IN A POSITION

13  TO ANSWER THAT.  I DON'T KNOW WHAT THE ANSWER IS.

14           THE COURT:  WE'RE FAR DOWN THE ROAD.

15           MR. HALL:  I UNDERSTAND.  BUT TO ANSWER YOUR

16  QUESTION, YOUR HONOR, IN A BIGGER STANDPOINT, THERE IS A

17  SUBSTANTIAL RISK IN TCPA CASES THAT MAKE HIGH SETTLEMENTS OR

18  MULTI-MILLION-DOLLAR SETTLEMENTS LOOK PALATABLE WHEN YOU

19  CONSIDER THE POTENTIAL LIABILITY.

20      THE WAY I READ THE BATEMAN DECISION, THE BATEMAN DECISION,

21  IT TALKS ABOUT AFTER THE JURY COMES BACK WITH THE AWARD, THE

22  COURT HAS THE DISCRETION TO REDUCE THE AWARD FROM HUNDREDS OF

23  MILLIONS AND BILLIONS OF DOLLARS DOWN TO SOMETHING MORE OF A

24  REASONABLE NATURE.

25      UNFORTUNATELY, FOR THE PARTIES, YOUR HONOR, THAT PLACES A

1   GREAT DEAL OF DISCRETION IN THE COURT AND BRINGS A CERTAIN

2   AMOUNT OF UNKNOWN AND, FRANKLY, FEAR TO THE PARTIES.  IT MAKES

3   SENSE TO SETTLE CASES WHERE THE PARTIES HAVE CONTROL OVER THE

4   SETTLEMENT.

5        BUT FURTHERMORE, WHEN YOU'RE LOOKING AT THE STRENGTHS OF

6   THE PLAINTIFF'S CASE, IT IS A FACTOR IN SIMPLY SAYING, WE THINK

7   THERE IS A CLAIM HERE, WE HAVE DEFENSES HERE, WITHOUT SOMETHING

8   MORE, I BELIEVE IT WOULD BE CONSTITUTING AN INSUFFICIENT

9   SHOWING FOR PURPOSES OF WHETHER OR NOT THE PLAINTIFF HAS A

10  STRONG ENOUGH CASE.

11       I AGREE, IS THERE INCENTIVE TO SETTLE?  ABSOLUTELY.  DOES

12  IT COME DOWN TO A BUSINESS DECISION?  ABSOLUTELY.  BUT WHEN THE

13  COURT TAKES A LOOK AT THIS, AND IT IS GOING TO BE AFFECTING THE

14  RIGHTS OF UNKNOWN CLASS MEMBERS, THE -- FRANKLY, THE

15  REPRESENTATIONS OF COUNSEL MAY NOT BE SUFFICIENT IN THIS CASE.

16       I UNDERSTAND THE COURT'S EXPERIENCE ON THAT.  I UNDERSTAND

17  THE COURT'S COMMENT.  BUT THAT'S PART OF THE ARGUMENT WHEN

18  EVALUATING WHAT THE STRENGTH OF THE CLASS IS.  ALSO, WHEN YOU

19  LOOK AT ONE OF THE OTHER ISSUES, IT TALKS ABOUT DISCOVERY AND

20  THE EXTENT OF DISCOVERY.  AGAIN, WHEN I REVIEWED THE BILLS THAT

21  WERE DONE IN THIS CASE, I SAW NOMINAL BILLINGS RELATING TO

22  WRITTEN DISCOVERY.

23       THESE WERE DONE IN THE SEPTEMBER -- I THINK SEPTEMBER,

24  OCTOBER, NOVEMBER 2010 TIMEFRAME IF MEMORY SERVES.  I DID NOT

25  SEE ANY BILLINGS RELATING TO DEPOSITIONS.  I DID NOT SEE MUCH

1    IN THE WAY OF THIRD-PARTY DISCOVERY.  I DID NOT SEE MUCH IN THE

2    WAY OF EVALUATIONS.  AND, IN FACT, THE DECLARATION OF

3    MR. TROUTMAN SUGGESTS THE EVALUATION OF RECORDS WAS DONE BY AN

4    OUTSIDE THIRD-PARTY SOURCE.  SO AGAIN, I THINK THERE IS ANOTHER

5    FACTOR IN THERE.  AND I ALSO GO BACK TO WHETHER OR NOT WHAT

6    WERE THE RESULTS FROM THE 400 TESTS AND WHETHER OR NOT THERE

7    WAS SUFFICIENT EVIDENCE TO EVALUATE WHETHER OR NOT THIS WAS AN

8    APPROPRIATE SETTLEMENT GIVEN THE SAMPLE SIZE.

9            THE COURT:  SO WHAT EXACTLY IS IT YOU WANT?  WHY

10   DON'T YOU CUT TO THE CHASE AND TELL ME EXACTLY WHAT YOU WANT.

11           MR. HALL:  FRANKLY, YOUR HONOR, I WOULD LIKE THE

12   COURT TO DENY THE MOTION -- DENY CLASS -- OR FINAL SETTLEMENT

13   APPROVAL AT THIS TIME UNLESS THERE IS MORE SUFFICIENT SHOWING,

14   AS WELL AS REDUCTION OF ATTORNEYS' FEES TO MORE MARKET-LEVEL

15   RATE.

16           THE COURT:  I SEE.  OKAY.  AND THE SUFFICIENT SHOWING

17   YOU THINK NEEDS TO BE MADE IS EXACTLY WHAT?

18           MR. HALL:  SOME EVIDENCE TO SHOW WHAT THE POTENTIAL

19   LIABILITY WAS.  FOR EXAMPLE, IN THE CASE THAT I LITIGATED

20   INVOLVING THE TCPA, WE HAD DEPOSITION TESTIMONY OF THE

21   PLAINTIFF, WHO TESTIFIED THAT SHE DID NOT GIVE HER TELEPHONE

22   NUMBER TO THE CALLER.

23           THE COURT:  OKAY.

24           MR. HALL:  WHETHER OR NOT THERE IS A CREDIBILITY

25   ISSUE OR WHETHER OR NOT --

1        THE COURT:  SO WAIT.  SO LET'S ASSUME THAT I GET A

2   DECLARATION THAT SAYS THAT THE PLAINTIFF DID NOT GIVE CONSENT

3   TO THE CALLER, RIGHT.

4        MR. HALL:  RIGHT.

5        THE COURT:  NOW WHAT?

6        MR. HALL:  NOW THE OTHER THING I'D LIKE TO KNOW IS,

7   WHAT WERE THE RESULTS, OR WHAT DID THE SAMPLE SIZE, WAS THAT

8   CONSISTENT WITH ALLOWING THE PARTIES TO PROPERLY EVALUATE WHAT

9   THE SETTLEMENT ISSUE WAS.

10        THE COURT:  AND THE SAMPLE SIZE SHOULD BE WHAT?

11        MR. HALL:  WHATEVER A STATISTICIAN BELIEVES IT WOULD

12   BE, A REASONABLY RELIABLE SOURCE.

13        THE COURT:  AND --

14        MR. HALL:  IT MAY BE 1,000; IT MAY BE 1,500; IT MAY

15   BE -- MAYBE 400.  WE DON'T KNOW.

16        THE COURT:  HOW WILL WE KNOW?

17        MR. HALL:  IF AN EXPERT CAME IN WITH A DECLARATION TO

18   SAY, WHEN YOU'RE DEALING WITH 5 MILLION MEMBERS, AND YOU LOOK

19   AT 400 FILES, THAT IS ENOUGH OF A SAMPLE SIZE TO BE ABLE TO SAY

20   THIS WAS WHAT I WOULD EXPECT TO SEE THE TREND, THE MARGIN OF

21   ERROR IN THAT SORT OF SAMPLE IS REDUCED.

22        THE COURT:  OKAY.  AND LET'S ASSUME THAT THE

23   PLAINTIFFS DO THAT, IS YOUR CLIENT GOING TO BE SATISFIED?

24        MR. HALL:  THE OTHER ISSUE WOULD BE THE ATTORNEYS'

25   FEES AS TO THE AMOUNT OF THE ATTORNEYS' FEES.  UNDER THIS CASE,

1    ATTORNEYS' FEES THAT WERE BILLED AT 700,000, WITH A FIVE TIMES

2    MULTIPLIER, WHICH WOULD BE EXCESSIVE.

3           THE COURT:  LOOK, ISN'T 25 PERCENT PRETTY MUCH THE

4    STANDARD ON THESE TYPES OF CASES?

5           MR. HALL:  I DON'T WANT TO SAY IT IS A STANDARD, YOUR

6    HONOR.  IT IS A TOOL.  AND WHAT THE NINTH CIRCUIT HAS SAID, THE

7    COURT MAY AWARD ATTORNEYS' FEES EITHER USING THE 25 PERCENT AS

8    A BENCHMARK OR MAY CROSS-CHECK IT AGAINST THE LODESTAR

9    METHODOLOGY.  THE COURT IS FREE TO USE EITHER ONE.

10        SO FROM THAT STANDPOINT, I HAVE TO ACKNOWLEDGE THAT, YES,

11   25 PERCENT IS AN ACCEPTABLE LEVEL OF ATTORNEYS' FEES TO JUSTIFY

12   AN AWARD.  HOWEVER, THE NINTH CIRCUIT ALSO ENCOURAGES COURTS TO

13   CROSS-CHECK THAT; ALTHOUGH NOT REQUIRED, BUT IT DOES ENCOURAGE

14   COURTS TO CROSS-CHECK IT.  BECAUSE A LODESTAR EVALUATION ALSO

15   SHOWS WHAT A REASONABLE FEE IS AT THAT TIME --

16          THE COURT:  AND BASED ON YOUR CALCULATIONS, WHAT

17   WOULD BE A REASONABLE FEE?

18          MR. HALL:  I WOULD SAY, YOUR HONOR -- FRANKLY, I

19   WOULD SAY PROBABLY A 2 PERCENT, OR TWO-TIMES MULTIPLIER WOULD

20   PROBABLY BE SUFFICIENT.  AT THE HOURLY RATES THAT ARE BEING

21   CHARGED, I BELIEVE MR. CAMPION --

22          THE COURT:  AND WHAT WOULD THAT RESULT AS A

23   PERCENTAGE?

24          MR. HALL:  I DID NOT DO THE CALCULATIONS, BUT I WOULD

25   PUT THAT AT 2 --

1          THE COURT:  12 PERCENT?

2          MR. HALL:  I WOULD SAY CLOSER TO ABOUT 10.

3          THE COURT:  10, OKAY.

4          MR. HALL:  THAT IS A QUICK ESTIMATE.

5          THE COURT:  THAT IS PRETTY QUICK, BUT THAT'S PRETTY

6  CLOSE.  I THOUGHT IT WOULD BE BETWEEN 10 AND 12 BASED ON --

7  GOOD ENOUGH.  ANYTHING ELSE?

8          MR. HALL:  NO, YOUR HONOR.  THANK YOU.

9          THE COURT:  ANYBODY ELSE HERE THAT WANTS TO SPEAK UP

10  AND OBJECT TO THE SETTLEMENT?

11          MR. BABBITT:  YOUR HONOR --

12          THE COURT:  WAIT, WHAT IS YOUR NAME?

13          MR. BABBITT:  MY NAME IS GREGORY BABBITT.  I DON'T

14  HAVE AN OBJECTION, BUT I'M SPECIALLY APPEARING FOR ATTORNEY

15  CARY FLITTER, IN PHILADELPHIA, WHO HAS A CLASS --

16          THE COURT:  YOU FILED AN ASSOCIATION?

17          MR. BABBITT:  I'M SORRY?

18          THE COURT:  HAVE YOU FILED AN ASSOCIATION OF COUNSEL?

19          MR. BABBITT:  I HAVE NOT, YOUR HONOR.  HE HAS NOT

20  FILED ANYTHING WITH THE COURT.  HE HAS A CLASS MEMBER WHO WANTS

21  TO OPT OUT OF THE CLASS SETTLEMENT, DIDN'T FILE AN OPT OUT, BUT

22  I HAVE A CERTIFICATE AND AN E-MAIL THAT SHE SENT TRYING TO --

23  THAT IT EXPRESSED HER INTENT THAT SHE DID NOT WANT TO BE PART

24  OF THE CLASS ACTION.  SO I'M HERE TO REQUEST THAT -- HER NAME

25  IS TAISHA DAY, REQUEST THAT SHE --

1       THE COURT:  I'M SORRY, WHAT IS HER NAME?

2       MR. BABBITT:  TAISHA, T-A-I-S-H-A, DAY, D-A-Y.  I'M

3  HERE TO REQUEST THAT SHE BE ALLOWED TO OPT OUT OF THE

4  SETTLEMENT.

5       THE COURT:  DO YOU HAVE ANYTHING AT ALL AS SIGNED BY

6  HER?

7       MR. BABBITT:  I DO.

8       THE COURT:  ANYTHING INDICATING -- OKAY, DO ME A

9  FAVOR, PLEASE HAND THAT TO MY COURTROOM DEPUTY.

10      OKAY, WELL, SHE CERTAINLY HAS A RIGHT TO OPT OUT OF THE

11  CLASS IF SHE WANTS TO.  SO WE'LL FILE THIS, AND SHE'S DONE.

12  GREAT.  THANK YOU.  APPRECIATE THAT.

13      MR. BABBITT:  SO, YOUR HONOR, JUST TO CONFIRM, SHE

14  CAN OPT OUT OF THE SETTLEMENT?

15      THE COURT:  ANYBODY HAVE ANY OBJECTION?

16      MR. CAMPION:  NO OBJECTION FROM THE PLAINTIFF, YOUR

17  HONOR.

18      MR. LONERGAN:  NO OBJECTION FROM THE DEFENSE.

19      THE COURT:  GREAT, SHE IS OUT.

20      MR. BABBITT:  THANK YOU, YOUR HONOR.

21      THE COURT:  ANYBODY HAVE ANYTHING ELSE THEY WISH TO

22  ADD?

23      MR. CAMPION:  WELL, YOUR HONOR, WE HAVE A FEW

24  COMMENTS TO MAKE ABOUT THE FINAL --

25      THE COURT:  YOU OUGHT TO RESPOND TO THE OBJECTIONS

1    THAT HAVE BEEN MADE.  OR SOMEBODY SHOULD DO THAT.

2              MR. CAMPION:  MR. SWIGART IS PREPARED TO DO THAT,

3    YOUR HONOR.

4              THE COURT:  OH, GOOD.

5              MR. SWIGART:  THANK YOU, YOUR HONOR.

6         I WAS HAVING BREAKFAST THIS MORNING WITH CO-COUNSEL,

7    CHECKING MY E-MAIL, AND I WAS A LITTLE SURPRISED TO SEE THAT

8    THERE WAS AN ASSOCIATION OF COUNSEL ASSIGNED AND FILED BY

9    MR. HALL IN THIS CASE.  AND I THOUGHT IT MUST HAVE BEEN A

10   MISTAKE.  BECAUSE HE WAS DEFENSE COUNSEL FOR A COMPANY,

11   ALLIANCE ONE, THAT WE HAD FILED AND LITIGATED A TCPA ACTION IN

12   THIS COURTHOUSE FOR OVER THREE YEARS IN FRONT OF JUDGE HOUSTON,

13   WHERE HE FOUGHT US EVERY STEP OF THE WAY, DISPOSITIVE MOTIONS.

14   AND WE FINALLY SETTLED THAT CASE.

15        AND HIS ARGUMENTS WERE ABSOLUTELY TO THE CONTRARY OF WHAT

16   HE MADE TODAY -- THE HIGH RISK OF LITIGATION, THE FACT THAT

17   THESE CASES SHOULDN'T BE CERTIFIED, AND THAT THEY SHOULDN'T

18   HAVE PAID $9 MILLION IN THAT CASE.

19        IN THIS CASE, WE'VE DONE BETTER THAN THAT.  WE'VE DOUBLED

20   THAT RECOVERY --

21             THE COURT:  WAIT, I GOT LOST.  EXPLAIN THAT TO ME ONE

22   MORE TIME.  I'M SORRY.

23             MR. SWIGART:  SURE.

24             THE COURT:  SO HE WAS REPRESENTING THE DEFENDANT IN

25   THE CLASS ACTION?

1         MR. SWIGART:  IN ALMOST AN IDENTICAL CLASS ACTION.

2         THE COURT:  OKAY.  AND WHAT WAS HE ARGUING IN THAT

3  CASE?

4         MR. SWIGART:  HE WAS ACTUALLY ARGUING EXACTLY THE

5  OPPOSITE OF WHAT HE'S ARGUING TODAY; THE FACT THAT THE

6  DEFENDANT SHOULDN'T PAY THAT MUCH MONEY, THESE CASES SHOULDN'T

7  BE CERTIFIED, THEY SHOULDN'T BE SETTLED.  AND IN THAT CASE, WE

8  WERE ABLE TO OBTAIN A $9 MILLION SETTLEMENT FOR THE CLASS, FOR

9  A CLASS SIZE ALMOST DOUBLE WHAT WE HAVE HERE TODAY, WHERE THE

10 RECOVERY WAS APPROXIMATELY $40.  AND IN THIS CASE, WE HAVE 85,

11 DOUBLE THE RESULT THAT THEY -- THAT WE OBTAINED IN THE OTHER

12 CASE.  AND SO --

13        THE COURT:  SO HIS CLIENT WAS WILLING TO SETTLE THE

14 CASE, THE PRIOR CASE, BUT IT WAS FOR LESS THAN HALF WHAT THIS

15 CASE IS BEING SETTLED FOR, PER CLASS PLAINTIFF, BASICALLY,

16 RIGHT?

17        MR. SWIGART:  PRECISELY, YOUR HONOR.  AND THAT CASE

18 WAS PENDING FOR ABOUT FOUR, FOUR-AND-A-HALF YEARS IN FRONT OF

19 JUDGE HOUSTON.  SO I HAD PREPARED TO DEAL WITH THESE OBJECTORS.

20 BUT IT WAS A LITTLE SURPRISING THIS MORNING TO FIND THAT FILING

21 OF ASSOCIATION.  I THOUGHT IT WAS IN ERROR BUT, PERHAPS, NOT.

22    SO I WANTED TO PUT THAT IN CONTEXT FOR THE COURT.  I

23 UNDERSTAND EVERY LAWYER NEEDS TO REPRESENT THEIR CLIENT, BUT I

24 THINK THERE SHOULD BE SOME WEIGHT GIVEN TO THE CREDIBILITY OF

25 HIS ARGUMENTS, ESPECIALLY WHEN HE WAS REPRESENTING THE OTHER

1   SIDE AND NEGOTIATED A SMALLER SETTLEMENT THAN WHAT WE HAVE HERE

2   TODAY.

3          THE COURT:  WELL, THAT'S WHAT LAWYERS DO, THOUGH.

4   LAWYERS REPRESENT THEIR CLIENTS; THEY DO THE BEST THEY CAN FOR

5   THEIR CLIENTS.

6          MR. SWIGART:  ABSOLUTELY.  WHICH IS WHAT I THINK

7   WE'VE DONE HERE, YOUR HONOR, ESPECIALLY ON BALANCE ON THE OTHER

8   CASES THAT HAVE BEEN SETTLED WITH THE TCPA.  THIS IS THE

9   SECOND-LARGEST MONETARY TCPA SETTLEMENT IN THE NATION'S

10  HISTORY.  THE ONLY ONE THAT WAS LARGER WAS THE SALLIE MAE CASE,

11  WHICH WE WERE ALSO A PART OF, WHICH IS $24 MILLION.  THE

12  RECOVERY IN THAT CASE PER CLASS MEMBER WAS $20.

13     IN THIS CASE, WE OBTAINED FOUR TIMES THAT RESULT FOR CLASS

14  MEMBERS.  JUST TAKING IT ON BALANCE, I MEAN, YOU HAVE -- YOU

15  HAVE APPROXIMATELY 4.3 MILLION CLASS MEMBERS THAT RECEIVED

16  NOTICE ON THIS CASE.  YOU HAVE 45 PEOPLE THAT WANTED TO OPT

17  OUT -- I GUESS 46 TODAY, YOUR HONOR.  46.

18          THE COURT:  DON'T WE HAVE ANOTHER ONE -- LET'S SEE,

19  LET ME SEE IF I CAN -- I THINK THERE IS ANOTHER ONE THAT SORT

20  OF SAID -- I THINK SHE WANTED TO BE IN, BUT SHE WANTED TO BE

21  OUT.  LET ME SEE IF I CAN REMEMBER.  TANYA BARRON FILED AN

22  OBJECTION.  SHE SAID SHE WANTED TO BE A CLASS ACTION MEMBER.

23  SHE WANTS TO PARTICIPATE IN THE CLASS ACTION LAWSUIT, BUT SHE

24  DOESN'T WANT TO GIVE UP ALL OF HER RIGHTS.  SO THAT IS KIND OF

25  LIKE -- WHAT'S THE OLD SAYING, KIND OF LIKE BEING A LITTLE

PREGNANT, I SUPPOSE.  I'M GOING TO TREAT THAT AS A DESIRE TO

OPT OUT OF THE CLASS.  SHE'S NOT HERE, BUT THAT'S THE BEST I

CAN DO.  SHE DOESN'T WANT TO GIVE UP ALL OF HER LEGAL RIGHTS.

SO THAT'S 47.  FORTY-SEVEN PEOPLE THAT HAVE CHOSEN TO OPT OUT

OUT OF HOW MANY PEOPLE WERE GIVEN NOTICE DID YOU SAY?

MR. SWIGART:  THERE WERE APPROXIMATELY 4.3 MILLION

MEMBERS IN THE CLASS THAT WERE IDENTIFIED.  AND I THINK NOTICE

WAS -- INDIVIDUAL NOTICE WAS SENT TO JUST UNDER 4 MILLION,

3.99 MILLION PEOPLE.  AND WE ALSO HAD A ROBUST NOTICE

PUBLICATION.  AND WE ALSO SPENT A CONSIDERABLE AMOUNT OF MONEY

ON INTERNET PUBLICATION AND THE DISCLOSURE OF THE SETTLEMENT

THAT WAY AS WELL.  SO IT WAS A PRETTY ROBUST NOTICE.  SO OUT OF

ALL OF THOSE PEOPLE, WE'RE DEALING WITH -- I DON'T KNOW IF MY

MATH ISN'T GREAT, BUT A COUPLE MILLIONS OF A PERCENT THAT

DECIDED TO OPT OUT AND EVEN LESS THAT DECIDED TO OBJECT TO THE

SETTLEMENT.

I MEAN, I HAVE TEN YEARS INTO PRACTICE, AND IT IS STILL

NOT THAT MUCH COMPARED TO MY COLLEAGUES IN THE ROOM.  BUT I'VE

DONE ENOUGH OF THESE CLASS ACTIONS WHERE I'M VERY SUSPICIOUS ON

SOME OF THESE OPT OUTS.  AND I UNDERSTAND THE COURT HAS --

THE COURT:  WHY IS THAT?

MR. SWIGART:  WELL, GOING BACK TO THE ALLIANCE ONE

CASE THAT MR. HALL WAS IN, WE ACTUALLY HAVE THE IDENTICAL

OBJECTOR IN THIS CASE, MR. MORGAN, REPRESENTED BY THE IDENTICAL

LAW FIRM THAT WAS IN THAT CASE, WHO FILED ALMOST THE IDENTICAL

1    OBJECTION, WHICH WAS OVERRULED BY JUDGE HOUSTON, LATER TAKEN UP

2    ON APPEAL, JUST TO EXTRACT A SETTLEMENT IN EXCHANGE FOR THE

3    DISMISSAL.  THE SAME THING HAPPENED IN THIS CASE --

4            THE COURT:  I SEE.  SO IN ESSENCE, IT IS SORT OF --

5    SORT OF LIKE, OKAY, SO I OBJECT, OR I OPT OUT IN ORDER TO BE

6    ABLE TO GET MORE THAN THE OTHER CLASS MEMBERS ARE GETTING?

7            MR. SWIGART:  IT'S NOT JUST A MATTER OF GETTING MORE

8    FOR THE CLASS MEMBERS; IT IS REALLY FOR THE ATTORNEYS.

9            THE COURT:  I SEE.

10           MR. SWIGART:  THE ATTORNEYS REPRESENTING THEM.

11      AND SO I THINK THE COURT HAS TO HAVE THIS BALANCING TEST.

12   AND I READ THE TRANSCRIPT OF MR. BLOOD, WHO ARGUED IN FRONT OF

13   JUDGE MOSKOWITZ ON THE HYDROXYCUT CASE A FEW WEEKS AGO.  I

14   THINK HE HAD SOME GOOD POINTS.  THE COURT REALLY NEEDS TO

15   BALANCE, YOU DON'T WANT TO INFRINGE ON THE DUE PROCESS RIGHTS

16   OF THE CLASS MEMBER TO OBJECT AND BRING UP REAL ISSUES WITH THE

17   COURT.  AND I THINK SOME OF THESE -- I CAN ADDRESS THEM.  I

18   DON'T THINK THEY'RE REAL ISSUES, BUT THEY HAVE A RIGHT TO BE

19   HEARD.  BUT THE COURT HAS TO BALANCE THAT AGAINST SOMEONE WHO

20   IS TRYING TO HIJACK A SETTLEMENT, AND FOR THEIR OWN PERSONAL

21   GAIN, TIE UP THE REST OF THIS CLASS MAYBE IN MALINTENT APPEALS.

22   SO THE COURT NEEDS TO BALANCE THAT.

23      AND SO WE LOOK VERY CLOSELY AT THESE OBJECTORS.  IN FACT,

24   I REACHED OUT AND ATTEMPTED TO REACH OUT TO EVERY SINGLE ONE.

25   AS AN EXAMPLE, THE LONGCHAMP OBJECTION.  I CALLED, AND SHE

1  HAPPENED TO BE A PRETTY NICE OLDER LADY OUT IN GEORGIA.  AND I

2  SPOKE TO HER ABOUT THE CASE AND WHAT HER OBJECTION WAS.  AND

3  QUITE FRANKLY, SHE TOLD ME, I DON'T THINK IT IS ENOUGH MONEY.

4  AND IT WAS A VALID OBJECTION, WHICH I THINK WE CAN ADDRESS

5  HERE.  THERE ARE SOME OTHER CROSS-OVER ISSUES.  SHE WAS

6  CONCERNED ABOUT THAT WELLS FARGO WAS FORECLOSING ON HER HOUSE.

7  THERE WERE SOME OTHER COLLECTION ISSUES.  SO I DON'T THINK SHE

8  UNDERSTOOD THE RELIEF WE OBTAINED UNDER THE TCPA SETTLEMENT.

9  BUT THAT'S A VALID OBJECTION.  I UNDERSTAND WHERE SHE'S COMING

10  FROM.

11      UNLIKE MR. MORGAN, WHO FILED THE SAME BOILERPLATE

12  OBJECTION.  THIS TIME THE ATTORNEY APPEARED BEFORE THE APPEALS

13  COULD BE FILED.  WHERE LAST TIME HE HAD -- HIS ATTORNEY HAD

14  FILLED OUT HIS OBJECTION, SIGNED HIS NAME, AND FILED IT IN

15  VIOLATION OF RULE 11, WITH THE COURT, AS HIS OWN OBJECTION, PRO

16  PER.  WE GOT THAT OUT AT DEPOSITION BY MR. MORGAN.

17      SO THOSE ARE THE TWO DIFFERENT TYPES OF OBJECTORS THAT I

18  THINK THE COURT SHOULD BE CONCERNED ABOUT.  THE DUNMORE AND

19  MORGAN GROUP, WHO ARE MORE OF THIS PROFESSIONAL SERIAL

20  OBJECTORS, AND MAYBE SOMEONE WHO IS TRYING TO VOICE A

21  LEGITIMATE CONCERN, LIKE THE LONGCHAMPS.

22      SO I CAN ADDRESS SOME OF THE OTHER ISSUES THAT WE THINK

23  MAY BE SOME OF THESE OBJECTORS THAT ARE TRYING TO RAISE SOME

24  VALID POINTS AS FAR AS NOTICE, OR FEES, OR THE RECOVERY.  I CAN

25  ADDRESS THOSE ISSUES.

1    THE COURT:  WHAT ABOUT MR. HALL'S COMMENT ABOUT THE

2  FACT THAT I DON'T HAVE ENOUGH INFORMATION BEFORE ME TO DECIDE

3  WHETHER OR NOT IT IS A FAIR SETTLEMENT BECAUSE I DON'T HAVE

4  ANYTHING SHOWING, OTHER THAN ATTORNEY DECLARATIONS, REGARDING

5  THE STRENGTHS OF THE CASE?  THAT DOES SEEM TO BE A VALID

6  CONCERN.  I'M NOT SAYING IT'S A VALID OBJECTION.  MEANING, I

7  DON'T KNOW THAT IT'S A -- I DON'T KNOW THAT HE'S MADE OUT HIS

8  CASE.  I'M JUST SIMPLY SAYING THAT CERTAINLY SOUNDS TO ME LIKE

9  SOMETHING THAT I SHOULD CONSIDER, RIGHT?

10    MR. SWIGART:  ABSOLUTELY, YOUR HONOR.  I THINK IT'S

11  SOMETHING YOU SHOULD CONSIDER.  AND I THINK IT'S SOMETHING WE

12  HAVE ADDRESSED IN OUR PAPERS, WHERE WE'VE OUTLINED WHAT THE

13  STRENGTHS AND WEAKNESSES OF THIS CASE ARE.  YOU HAVE VERY

14  EXPERIENCED COUNSEL ON BOTH SIDES TODAY.  OUR FIRMS, BOTH OF

15  THEM, WE DO A LOT OF THIS TCPA LITIGATION, SO WE'RE VERY

16  FAMILIAR WITH THE DEVELOPMENTS OF THE CASE LAW AND HOW THE

17  DISCOVERY SHOULD BE TAILORED, AND WHAT THE STRENGTHS AND

18  WEAKNESSES OF THE CASE ARE.  AND I THINK WE PUT SOME OF THAT IN

19  THE PAPERS.

20    I THINK WHAT IS NOTABLE IS THAT WE WENT THROUGH A VERY

21  DETAILED SAMPLING PROCESS THAT TOOK QUITE A BIT OF WRANGLING TO

22  DETERMINE.  AND WE CONDUCTED TWO DIFFERENT MEDIATIONS IN FRONT

23  OF TWO WELL-RESPECTED JUDGES, JUSTICE WIENER ON THE FIRST HALF,

24  AND WE WENT BACK AND GOT MORE DATA SO WE COULD BETTER EVALUATE

25  THE STRENGTHS AND WEAKNESSES OF OUR CASE.  AND WE WENT AGAIN IN

1  FRONT OF JUDGE PAPPAS, WHO BOTH SAW -- WHO SAT ON BOTH SIDES OF

2  THE TABLE --

3          THE COURT:  THOSE ARE BOTH EXCELLENT MEDIATORS, I

4  MIGHT ADD.  I KNOW THEM BOTH.  I KNOW THEM BOTH WELL.  AND

5  THEY'RE CERTAINLY CREAM OF THE CROP.

6          MR. SWIGART:  AND I ASSURE YOU, YOUR HONOR, IT WASN'T

7  A SITUATION WHERE WE ALL GOT IN A ROOM, AND A DEAL WAS HAMMERED

8  OUT VERY QUICKLY.  THIS WAS A LONG PROCESS.  IT WAS HARD

9  FOUGHT, AND I THINK IT WAS FINALLY A RECOMMENDATION AT THE END

10 OF THE SECOND DAY ON HOW WE'RE GOING TO SETTLE THIS CASE, WHICH

11 WAS FINALLY ACCEPTED.  SO BOTH SIDES GAVE IN.  AND AS FAR AS

12 THE STRENGTHS AND WEAKNESSES, I THINK BOTH SIDES --

13         THE COURT:  SO JUDGE PAPPAS WAS ACTIVE IN NEGOTIATING

14 THE SETTLEMENT OF THIS CASE?

15         MR. SWIGART:  WAS EXTREMELY ACTIVE, YOUR HONOR.

16         THE COURT:  YOU KNOW, HE WAS THE ONE THAT SETTLED THE

17 ARCHDIOCESE CASE, ONE OF THE BIGGEST, MOST HIGH-PROFILE CASES

18 IN THE SOUTHERN DISTRICT.  AND HE DID A -- MAYBE EVEN IN THE

19 COUNTRY.  HE DID AN EXCELLENT JOB GETTING THAT CASE SETTLED.

20 SO YOU'RE SAYING THAT JUDGE PAPPAS MEDIATED THIS, AND HE HEARD

21 THE STRENGTHS AND WEAKNESSES OF BOTH SIDES?

22         MR. SWIGART:  ABSOLUTELY, YOUR HONOR.  NOT JUST JUDGE

23 PAPPAS --

24         THE COURT:  I KNOW.  YOU SAID JUDGE WIENER WAS

25 INVOLVED AS WELL.

1          MR. SWIGART:  YES, YOUR HONOR.

2          THE COURT:  OR JUSTICE WIENER.

3     SO HE HEARD THE STRENGTHS AND WEAKNESSES OF BOTH SIDES AND

4  CONCLUDED THAT THIS WAS A FAIR SETTLEMENT IN HIS VIEW; IS THAT

5  A FAIR STATEMENT?

6          MR. SWIGART:  YES, YOUR HONOR.  THAT IS A VERY FAIR

7  STATEMENT.

8          THE COURT:  AND I THINK WHEN I FIRST GOT THE CASE, I

9  CONCLUDED THAT IT WAS -- PRELIMINARILY THAT IT WAS A FAIR

10 SETTLEMENT AT THAT TIME.

11     OKAY, GO AHEAD.

12          MR. SWIGART:  JUST A COUPLE OF POINTS THAT MR. HALL

13 RAISED.  AS FAR AS THE -- THESE OBJECTORS, ONE OF THE ISSUES

14 THAT WE HAVE WITH THE OBJECTORS IN LOOKING AT SOME OF THE

15 PROFESSIONALS, IS THE TIMING OF THESE OBJECTIONS.  IT WAS A

16 LENGTHY NOTICE PERIOD.  IN THE LAST DAY, ALMOST THE LAST HOUR,

17 YOU HAVE THESE FILED OBJECTIONS THAT ARE CANNED FROM OTHER

18 CASES.  AND I THINK THE COURT NEEDS TO BE SUSPICIOUS OF THAT

19 AND WHAT THEIR TRUE INTENT IS.  BUT SOME OF THE ISSUES THEY

20 RAISE --

21          THE COURT:  I FIND IT ODD THAT THE LEFT HAND DOESN'T

22 KNOW WHAT THE RIGHT HAND IS DOING, AND THEY SEND TWO LAWYERS IN

23 ON THE DAY -- I'VE NEVER HAD THIS HAPPEN BEFORE.  IT IS ALL

24 KIND OF ODD TO ME.  NOT ONLY IS IT ODD THAT ON THE VERY LAST

25 DAY, THE LAST MOMENT, A LAWYER SHOWS UP WITH OBJECTIONS, BUT IT

1   IS EVEN MORE ODD THAT TWO LAWYERS SHOW UP REPRESENTING THE SAME

2   PARTY.  BUT IT JUST KIND OF IS ODD.  ANYWAY, GO AHEAD.

3            MR. HALL:  ALL RIGHT --

4            THE COURT:  JUST AN OBSERVATION, COUNSEL.  I MEAN,

5   YOU KNOW --

6            MR. WEAVER:  IF I --

7            THE COURT:  YES, SIR.

8            MR. WEAVER:  I'M REPRESENTING FROM CALIFORNIA

9   COUNSEL, YOUR HONOR.  I WAS ASSIGNED THIS LAST NIGHT AROUND

10  5:30.  I KNOW THERE IS A TIME ZONE CHANGE BETWEEN FLORIDA AND

11  CALIFORNIA, SO I'M NOT SURE WHAT THE CORRESPONDENCE OR

12  COMMUNICATIONS WERE BETWEEN THE CALIFORNIA COUNSEL AND THE

13  FLORIDA COUNSEL.

14           THE COURT:  YEAH, I DON'T, EITHER.  IN FACT, I'M NOT

15  SURE I KNOW WHY THERE IS FLORIDA COUNSEL AND CALIFORNIA

16  COUNSEL.  AND WHEN WAS THE PRELIMINARY APPROVAL?  REFRESH MY

17  RECOLLECTION.  IT WAS QUITE SOME TIME AGO, WASN'T IT?

18           MR. SWIGART:  FEBRUARY -- EARLY FEBRUARY, YOUR HONOR.

19           THE COURT:  DON'T YOU THINK THAT IS KIND OF ODD,

20  COUNSEL?

21           MR. WEAVER:  I THINK THAT CALIFORNIA COUNSEL WANTED

22  TO ENSURE THAT THERE WAS SOMEBODY HERE AT THIS HEARING TO

23  REPRESENT THE CLIENT.

24           THE COURT:  BECAUSE HE OR SHE COULDN'T BE HERE AFTER

25  ALL THIS TIME?

1          MR. WEAVER:  CALIFORNIA COUNSEL IS NORTH OF

2    LOS ANGELES.

3          THE COURT:  NO?  REALLY?  NORTH OF LOS ANGELES?

4    REALLY?  OH, MY GOSH, YOU'RE KIDDING ME?

5          MR. WEAVER:  NO, I'M NOT KIDDING YOU.

6          THE COURT:  I'M BEING A LITTLE -- I'M TEASING YOU A

7    LITTLE BIT.  BUT REALLY, SERIOUSLY?  REALLY?  WHEN I WAS A

8    LAWYER, I APPEARED JUST ABOUT EVERYWHERE IN THIS -- CROSS

9    COUNTRY, LA.  I USED TO DRIVE TO LA FROM IMPERIAL COUNTY QUITE

10   REGULARLY.  FROM THERE TO LA IS ABOUT A THREE-AND-A-HALF HOUR,

11   FOUR-HOUR DRIVE.  FROM HERE TO LA IS MAYBE -- ASSUMING YOU GET

12   STUCK IN TRAFFIC, IT IS A TWO-HOUR DRIVE.  COUNSEL COULDN'T BE

13   HERE?  THEY CONTACTED YOU THE NIGHT BEFORE AND ASKED YOU TO BE

14   HERE AND COME INTO THE LION'S DEN?  I HOPE THEY'RE PAYING YOU

15   WELL, COUNSEL.

16         MR. WEAVER:  I HAVE HAD HEARINGS IN WASHINGTON, D.C.,

17   NEW YORK.

18         THE COURT:  OF COURSE YOU HAVE.

19         MR. WEAVER:  SO I CAN'T REPRESENT WHY CALIFORNIA

20   COUNSEL IS NOT HERE TODAY.  I DON'T HAVE A NOTE FROM HIS

21   PROCTOR.  I DON'T HAVE A NOTE FROM HIS WIFE.  ALL I'M TELLING

22   YOU IS I WAS TOLD LAST NIGHT AROUND 5:30, SO I AM HERE.  I'M

23   NOT SURE WHAT THE COMMUNICATION WITH THE FLORIDA LAWYER WAS,

24   WITH OTHER COUNSEL.  THAT'S ALL I'M EXPLAINING BECAUSE YOU'RE

25   SKEPTICAL.

1          THE COURT:  IT IS ODD.  DON'T YOU THINK IT'S ODD THAT

2     ON THE DAY OF THE OBJECTIONS, TWO LAWYERS SHOW UP, ONE

3     APPARENTLY REPRESENTING CALIFORNIA COUNSEL, WHO CAN'T FIND HIS

4     OR HER WAY DOWN FROM LA.  THAT WAGON TRAIN, IT TAKES A LONG

5     TIME TO GET DOWN HERE.  AND THE SECOND ONE IS FROM FLORIDA.  IT

6     IS JUST ODD, COUNSEL.  THAT'S ALL I'M SAYING.  BY THE WAY, I

7     HOPE THEY'RE PAYING YOU WELL BECAUSE I'M KIND OF BEATING UP ON

8     YOU A LITTLE BIT.  YOU NOTICE I HAVE A LITTLE BIT OF A SMILE ON

9     MY FACE.  I HAVE TO ENJOY MY JOB A LITTLE BIT.  BUT YOU

10    UNDERSTAND I THINK THIS IS A LITTLE ODD.  ANYWAY, SO THAT'S

11    OKAY.  YOU'VE DONE YOUR JOB.  THANK YOU.

12         MR. SWIGART:  JUST TO HIT THE HIGHLIGHTS, YOUR HONOR.

13    I DON'T WANT TO BELABOR THE POINT.  TALK ABOUT FEES REAL QUICK.

14    MR. HALL IS ARGUING WE'RE TAKING TOO MUCH IN FEES, OR THE WAY

15    IT IS BEING DISTRIBUTED.

16         THE COURT:  YEAH, YOU REMEMBER THAT -- I THINK I BEAT

17    UP ON YOU THE LAST TIME YOU GUYS WERE HERE.  AND I TOLD YOU I

18    THOUGHT THE FEES WERE WAY TOO HIGH.  FRANKLY, I STILL THINK

19    THEY'RE A LITTLE HIGH, BUT GO AHEAD.

20         MR. SWIGART:  AND WE HEARD YOU, YOUR HONOR.  AND

21    THAT'S WHY WE REDUCED IT FROM THE BENCHMARK DOWN IN THE NINTH

22    CIRCUIT.  I THINK THAT --

23         THE COURT:  WHAT ABOUT MR. HALL'S ARGUMENT, THAT NOW

24    YOU'RE BASICALLY SHIFTING?  WHAT YOU'VE REALLY DONE IS REDUCED

25    YOUR FEES, BUT YOU PASSED THEM ON TO SOMEBODY ELSE, SO THE END

1   RESULT IS ESSENTIALLY THE SAME, RIGHT?

2            MR. SWIGART:  I'M NOT SURE I FOLLOW HIS LOGIC AS FAR

3   AS SHIFTING THE FEES ON TO SOMEONE ELSE.

4            THE COURT:  WELL, HE'S SAYING THAT BASICALLY, USUALLY

5   THE ADMINISTRATOR FEES ARE PAID BY THE PLAINTIFF.  AND,

6   FRANKLY, AS I SIT HERE, I WAS TRYING TO THINK OF OTHER CASES

7   I'VE SETTLED, OTHER CLASS ACTION CASES, AND I'M TRYING TO

8   FIGURE OUT, IS THAT REALLY TRUE?  AND I CAN'T TELL YOU AS I SIT

9   HERE.  BUT THAT'S WHAT HE'S SAYING.  HE'S SAYING, LOOK, WHAT

10  YOU DID IS, YOU REDUCED YOUR FEES, BUT INSTEAD OF PAYING FOR

11  THE ADMINISTRATOR COSTS, YOU'RE NOW ASKING THAT THOSE COSTS BE

12  PAID OUT OF THE COMMON FUND.

13           MR. SWIGART:  THERE IS A COUPLE ISSUES WITH THAT.

14  FIRST OF ALL, THE CASE LAW SUPPORTS AND THE MANUAL FOR

15  ACCOMPLISHED LITIGATION SUPPORTS THE FACT THAT THE CLASS

16  MEMBERS THAT ARE RECEIVING THE BENEFIT OF THE SETTLEMENT, THEY

17  SHOULD EQUALLY BEAR THE COST.  BUT I THINK WHAT IS INTERESTING

18  IS, I CAN'T THINK OF A CASE EITHER, AND IT'S NOT FOR LACK OF

19  TRYING.  AND I THINK IF MR. HALL WAS TO BE GENUINE WITH THE

20  COURT, HE AGREED TO THE IDENTICAL SETTLEMENT THAT WE HAVE HERE

21  IN THE ADAMS CASE.  AND, IN FACT, HE SUPPORTED 30 PERCENT, WITH

22  A MULTIPLIER OF JUST UNDER 5 IN A VERY SIMILAR CASE THAT WAS

23  ULTIMATELY APPROVED AT 30 PERCENT BY JUDGE HOUSTON.

24           THE COURT:  YOU KEEP TALKING ABOUT THAT.  WHEN I WAS

25  A YOUNG LAWYER, I APPEARED ONCE BEFORE THE SAME JUDGE TWO WEEKS

1  APART, ARGUING THE COMPLETELY OPPOSITE SIDE OF THE CASE.  AND

2  THE JUDGE LOOKED AT ME AND SAID, BUT WEREN'T YOU HERE LAST WEEK

3  ARGUING THE COMPLETE OPPOSITE OF THIS CASE?  AND I SAID, YEAH,

4  BUT THAT IS WHAT WE LAWYERS GET PAID TO DO.  SO WHAT?  SO HE

5  WAS HERE, AND HE AGREED TO 30 PERCENT AND ALL THAT.  SO WHAT?

6            MR. SWIGART:  WELL, I THINK THE COURT AGREED, TOO,

7  YOUR HONOR.  THAT IS MY POINT.  THE COURT HAS AGREED, AND THEY

8  SYSTEMATICALLY AGREED.  ESPECIALLY IN THIS CASE, IF YOU TAKE A

9  LOOK AT JUDGE SABRAW, IN GUTIERREZ VS. BARCLAYS, SAME TYPE OF

10 DISTRIBUTION MADE ON A COMMON FUND CASE.  THE ARTHUR VS. SALLIE

11 MAE CASE, THE OTHER CASE WE'RE INVOLVED IN, WITH A $24 MILLION

12 RECOVERY, SAME DISTRIBUTION.  SARABRI VS. WELTMAN, WEINBERG AND

13 REIS.

14            THE COURT:  WHAT ABOUT THE ONES WHERE THERE WAS A

15 DIFFERENT DISTRIBUTION, A LESSER DISTRIBUTION?

16            MR. SWIGART:  I CAN'T THINK OF ONE, YOUR HONOR.

17            THE COURT:  REALLY?  SURE?

18            MR. SWIGART:  I CAN'T THINK OF A CASE WHERE THERE WAS

19 A NET RESULT, WHERE THE COSTS WERE PAID FIRST AND THEN THE

20 ATTORNEYS' FEES ARE CALCULATED.  AND THAT'S TYPICALLY NOT HOW

21 YOU DO A COMMON-FUND APPROACH TO A FIELD WORK.

22            THE COURT:  OKAY.

23            MR. SWIGART:  SO AS FAR AS THEIR ARGUMENT THAT THERE

24 IS NOT ENOUGH MONEY, I THINK MR. HALL'S ARGUMENT IS REALLY

25 COUNTER-INTUITIVE.  HE IS SAYING THAT THESE CASES ARE SO

1  COMPLEX, AND THERE IS SO MUCH RISK WITH THE PRIOR CONSENT, THAT

2  THEY'RE REALLY WORTHLESS.  SO I'M NOT QUITE SURE HOW GETTING A

3  $17 MILLION RESULT, WHICH IS THE SECOND HIGHEST IN TCPA

4  HISTORY, IS A BAD RESULT.  ESPECIALLY WHEN YOU LOOK AT THE

5  COMPARABLE CASES, THE ONES THAT I WENT THROUGH, THE SARABRI VS.

6  WELTMAN CASE.  THAT WAS A $48 DISTRIBUTION.  LEMIEUX VS. GLOBAL

7  CREDIT ACCEPTANCE, $70.  EVEN THE ADAMS CASE, THAT WAS A $40

8  DISTRIBUTION.  THIS IS A VERY HIGH-DOLLAR AMOUNT PAID PER CLASS

9  MEMBER AND ACTUALLY AN EXCELLENT RESULT.  I THINK JUST FROM A

10  20,000-FOOT VIEW, I THINK IT'S EASY TO HAVE A CLIENT, A CLASS

11  MEMBER, NOT BRING YOUR OWN CASE INDIVIDUALLY, NOT BRING YOUR

12  OWN CASE AS A CLASS, AND INCUR ALL THE FEES AND THE COSTS AND

13  THE RISKS IN BRINGING THE CASE FORWARD, AND JUST WAIT FOR

14  SOMEONE ELSE TO INCUR THAT AND GET A GOOD RESULT.  AND THEN ON

15  THE LAST DAY, OF THE LAST HOUR, FILE YOUR OBJECTION, HAVE

16  NOTHING TO RISK AND SAY, YOU DIDN'T DO GOOD ENOUGH, YOU DIDN'T

17  GET A GOOD ENOUGH RESULT, AND THAT'S EXACTLY WHAT THEY'RE DOING

18  HERE.

19      AND REALLY, IF THEY'RE GOING TO TRY TO SOMEHOW BETTER THE

20  SETTLEMENT AND THEN LATER COME IN AND ASK FOR SOME TYPE OF

21  ENHANCEMENT OR FEE AWARD, IT RUBS ME THE WRONG WAY, YOUR HONOR.

22  WE'RE THE ONES WHO EXPENDED THE RISK AND THE SKILL IN OBTAINING

23  THIS RESULT, WHICH IS A VERY GOOD RESULT ON BALANCE.  AND I

24  THINK THE COURT SUPPORTS THAT IN THE FINDING ON PRELIMINARY

25  APPROVAL.  WE'RE SAYING, PRELIMINARILY, THIS LOOKS LIKE A FAIR

1  AND REASONABLE SETTLEMENT.  SO WHEN YOU TAKE THAT ON BALANCE

2  WITH THE NUMBER OF PEOPLE --

3        THE COURT:  YOU KNOW, I DID.  AND I GUESS IT WOULD

4  HAVE BEEN NICE TO HAVE SOMEBODY COME IN AT THE PRELIMINARY

5  APPROVAL HEARING AND INDICATE OTHERWISE SO WE WOULD HAVE SAVED

6  OURSELVES A WHOLE BUNCH OF TIME AND EFFORT AND SO ON.  I AGREE.

7        MR. SWIGART:  IF I CAN LEAVE YOU WITH THIS, YOUR

8  HONOR:  REALLY THE PURPOSE OF AN OBJECTOR IS TO COME IN AND

9  SAY, JUDGE, THIS SETTLEMENT IS BELOW THE STANDARD OF

10  REASONABLENESS, AND HERE IS THE REASONS WHY IT'S BELOW THE

11  STANDARD OF REASONABLENESS.  AND SO WE WANT YOU TO HEAR OUR

12  OBJECTIONS AND FOLLOW WHAT WE'RE SAYING SO WE CAN BRING THIS

13  CASE TO A LEVEL OF REASONABLENESS.  BUT FROM -- WHAT I'VE

14  EXPLAINED TO THE COURT, AND WHAT WE'VE PUT IN OUR PAPERS, THIS

15  CASE WAS ALREADY THERE AS FAR AS BEING A REASONABLE SETTLEMENT.

16  IT IS A REALLY GOOD SETTLEMENT.  SO THESE BOILERPLATE

17  OBJECTIONS ABOUT NOT ENOUGH MONEY, TOO MUCH FEES, ETC. --

18        THE COURT:  LET ME INTERRUPT YOU.  WHEN YOU SAID THIS

19  WAS THE SECOND-HIGHEST TCPA CASE THAT HAS BEEN SETTLED, WERE

20  YOU TALKING ABOUT TOTAL DOLLAR AMOUNTS OR PER CLASS PLAINTIFF?

21        MR. SWIGART:  I'M TALKING TOTAL DOLLAR AMOUNT, YOUR

22  HONOR.  AND I DO WANT A POINT OF CLARIFICATION.  JUDGE MILLER

23  THAT WE WERE INVOLVED IN APPROVED THE IN RE JIFFY LUBE CASE,

24  WHICH WAS AN MDL ACTION.  THAT SETTLED FOR $47 MILLION.  BUT IT

25  WAS NOT A CASH SETTLEMENT.  IT HAD TO DEAL WITH COUPON,

1  COUPON-ESK TYPE OF SETTLEMENTS.  AS FAR AS CASH SETTLEMENTS ARE

2  CONCERNED, THIS IS THE SECOND HIGHEST ON RECORD SO FAR THAT HAS

3  BEEN -- THAT'S THE FINAL APPROVAL.

4         THE COURT:  PER CLASS MEMBER, PER INDIVIDUAL CLASS

5  MEMBER?

6         MR. SWIGART:  PER CLASS MEMBER, THE CASES I CITE AND

7  I'VE BEEN INVOLVED IN, IT IS ONE OF THE HIGHER ONES.  THERE ARE

8  SOME OTHER CASES THAT WOULD GIVE A RANGE AROUND $100 PER CLASS

9  MEMBER --

10         THE COURT:  AND THIS WAS 85?

11         MR. SWIGART:  JUST BELOW 85, YOUR HONOR, YES.

12         THE COURT:  OKAY.

13         MR. SWIGART:  SO IT'S COMPARABLE.  IT HAS BEEN AS LOW

14  AS $20.  SO IT IS WELL WITHIN THAT RANGE AND ACTUALLY TOWARD

15  THE UPPER END OF THAT RANGE AS FAR AS CLAIMS BEING PAID, THE

16  AMOUNT BEING PAID OUT.  SO I THINK TAKING THAT IN BALANCE, IT

17  SUPPORTS A FINDING THAT THIS SETTLEMENT IS FAIR AND REASONABLE

18  AND ADEQUATE, AND THESE OBJECTORS SHOULD BE SEEN FOR WHAT THEY

19  ARE.  I THINK AN ATTEMPT TO HIJACK THIS CASE REALLY FOR THEIR

20  OWN PERSONAL GAIN.

21         THE COURT:  ALL RIGHT.  DOES THE DEFENSE HAVE

22  ANYTHING -- BY THE WAY, I HAVE A JURY THAT IS WAITING TO COME

23  BACK IN.  I HAVE A TRIAL THAT IS GOING TO START AT 10:00, SO IF

24  YOU CAN MAKE IT QUICK, I'D APPRECIATE IT.

25         MR. LONERGAN:  I WILL, YOUR HONOR.  THANK YOU.  THREE

1  POINTS I'D LIKE TO BRIEFLY ADDRESS.  FIRST OF ALL, WELLS FARGO

2  WOULD ACTUALLY AGREE WITH A NUMBER OF THE POINTS THAT MR. HALL

3  MADE.  HAVING LEARNED ABOUT HIS PREVIOUS INVOLVEMENT ON THE

4  DEFENSE SIDE OF THESE CASES, I NOW UNDERSTAND WHY WE'RE OF LIKE

5  MIND ON THESE POINTS.  BUT IT IS VERY TRUE THAT THESE CASES ARE

6  EXCEPTIONALLY DIFFICULT TO CERTIFY.  AND WE'VE PROVIDED THE

7  COURT WITH THE CASE AUTHORITIES THAT BEARS THAT OUT.

8      IT IS ALSO TRUE, WE WOULD HOPE AND BELIEVE, THAT IN A CASE

9  LIKE THIS, WITH WHAT IS CLEARLY A HYPER-TECHNICAL SORT OF

10  CLAIM, WITH POTENTIALLY, YOU KNOW, MONSTROUS DAMAGES, THAT

11  COURTS WOULD HAVE AND SHOULD HAVE DISCRETION TO REDUCE DAMAGE

12  AWARDS, BOTH OF WHICH GO TO OUR POINT THAT THE SETTLEMENT HERE

13  IS A VERY FAIR AND ADEQUATE ONE GIVEN THOSE RISKS.

14      THE COURT:  SO I THINK WE TALKED ABOUT THIS LAST

15  TIME.  I KNOW THAT THE TCPA EXISTS, AND I UNDERSTAND THIS $500

16  PER VIOLATION STATUTE AND SO ON.  SO WHAT YOU'RE SAYING IS, IF

17  THIS CASE WERE TO GO TO TRIAL AND A $4 BILLION JUDGMENT WAS

18  RETURNED BY A JURY, THIS COURT WOULD HAVE DISCRETION TO REDUCE

19  THAT, RIGHT?  AND THAT WAS PART OF THE BASIS FOR YOUR DECISION

20  TO SETTLE THE CASE, RIGHT?

21      MR. LONERGAN:  YES.  YOUR HONOR WOULD CERTAINLY NOT

22  BE SURPRISED TO SEE ME ARGUING IF THAT UNHAPPY DAY ARRIVED.

23      THE COURT:  AND YOU RECALL MY COMMENTS AT -- I THINK

24  IT WAS AT THE PRELIMINARY SETTLEMENT APPROVAL HEARING, WHICH

25  SAID THAT, SO, GREAT, SO THERE IS A JUDGMENT RETURNED AGAINST

1  WELLS FARGO FOR $4 BILLION.  AND I'M SURE THAT THE BOARD OF

2  DIRECTORS OF WELLS FARGO IS JUST GOING TO TAKE THE $4 BILLION

3  OUT OF THEIR POCKET IN ORDER TO PAY THE JUDGMENT, AS OPPOSED TO

4  SAYING, WELL, I GUESS WE HAVE TO INCREASE THE FEES THAT WE

5  CHARGE OUR CUSTOMERS, AND OUR DEPOSITORS, AND, PERHAPS, CHARGE

6  HIGHER RATES ON OUR MORTGAGES.  AND EVENTUALLY THE PEOPLE THAT

7  WIND UP PAYING FOR THIS ANYWAY IS NOT REALLY WELLS FARGO, IT'S

8  THE PEOPLE WHO DO BUSINESS WITH WELLS FARGO.

9       SO THE ODDS OF THIS COURT PROBABLY REDUCING ANY JUDGMENT

10  THAT WOULD BE RETURNED BY A JURY WOULD PROBABLY BE PRETTY GOOD,

11  GIVEN THE FACT THAT I THINK THE STATUTE IS NO DOUBT WELL

12  INTENDED, BUT I THINK THAT IT PUNISHES THE WRONG PEOPLE, WHICH

13  ARE THE CUSTOMERS AND THE PEOPLE WHO DO BUSINESS WITH WELLS

14  FARGO.  ANYWAY.

15            MR. LONERGAN:  I DO RECALL THOSE COMMENTS.

16            THE COURT:  YEAH, YOU REMEMBER THAT.

17            MR. LONERGAN:  IT'S ALSO TRUE, AS MR. HALL POINTS

18  OUT, AND I DON'T THINK THIS IS A SURPRISE, THAT WELLS FARGO

19  MADE A BUSINESS DECISION IN SETTLING THIS CASE.  THERE IS NO

20  DOUBT ABOUT IT.  IN REACHING THAT DECISION, IT EVALUATED ALL

21  THE LEGAL AUTHORITIES WE PROVIDED THE COURT WITH.  IT EVALUATED

22  THE FACTS IN MAKING A DECISION TO SETTLE THIS.  I WOULD

23  DISAGREE STRENUOUSLY WITH MR. HALL'S SUGGESTION THAT THERE

24  ISN'T SUFFICIENT EVIDENCE THAT THE STRENGTH OF THE CASE OR THE

25  VALUE WAS WEIGHED BY THE PARTIES.  TO THE CONTRARY, AS WE'VE

1    TALKED A LITTLE BIT ABOUT TODAY, AND WAS IN THE PRELIMINARY

2    APPROVAL PAPERS, YOUR HONOR KNOWS THERE WAS SEVERAL ATTEMPTED

3    MEDIATIONS.  AFTER THE FAILED MEDIATION WITH JUSTICE WIENER,

4    THERE WAS THE SAMPLING PROCESS THAT WAS BROUGHT TO THE COURT'S

5    ATTENTION.

6         IN FACT, WE COULD NOT HAVE SETTLED THIS CASE AT

7    PLAINTIFF'S INSISTENCE HAD WE NOT GONE THROUGH THIS.  IT WAS

8    VIGOROUS.  PLAINTIFFS INSISTED UPON A RANDOM IDENTIFICATION OF

9    ACCOUNTS AND PROVISION OF DOCUMENTATION TO PROVE OUR POINT THAT

10   THERE WERE -- THERE WAS CONSENT IN A GREAT MAJORITY OF CASES,

11   AND IT COMES IN VARIOUS FORMS.  WE PROVIDED THAT.  THE SAMPLING

12   SERVED SEVERAL PURPOSES.  IT IS NOT SIMPLY TO COME UP WITH WHAT

13   IS THE TOTAL AMOUNT OF EXPOSURE.  THE OBJECTORS SAY 2 BILLION.

14   THAT IS PREMISED UPON THE FAULTY NOTION THAT NO ONE GAVE

15   CONSENT.  THAT IS NOT TRUE.

16        BUT, FRANKLY, NO ONE KNOWS EXACTLY WHAT THE EXACT NUMBER

17   IS AND COULD NEVER KNOW UNLESS YOU WENT THROUGH A TRIAL ON THE

18   MERITS.  BUT WHAT THE SAMPLING, WHICH WE DID AT PLAINTIFF'S

19   INSISTENCE, SHOWED IS THAT THERE IS A WIDE VARIETY OF MANNERS

20   IN WHICH CONSENT WAS PROVIDED.  THE ROBUST CONSENT PROGRAM OF

21   WELLS FARGO WAS EFFECTIVE IN A GREAT MAJORITY OF CASES.  AND

22   WE'VE EXPLAINED IN DETAIL WHAT THAT EVIDENCE SHOWED, AND THAT'S

23   BEEN PROVIDED TO THE COURT.  SO, YES, WE CAN'T SAY THE NUMBER

24   WAS X OR Y, BUT WE CAN SHOW, AND PLAINTIFF SATISFIED THEMSELVES

25   AS CLASS COUNSEL DID, THAT THE ACTUAL EXPOSURE IS A SMALL

1    PERCENTAGE OF THE 2 BILLION PLUS THAT THE OBJECTORS ASSUMED.

2        AND YOU CAN NEVER HAVE AN ADJUDICATION OF WHETHER THERE IS

3    STANDING FOR A PARTICULAR PERSON OR OBJECTOR WITHOUT GOING

4    THROUGH THAT TRIAL ON THE MERITS.

5        EVEN MR. DUNMORE, THE OBJECTOR, AND I'M NOT GOING TO SIT

6    HERE AND DIVULGE HIS PRIVATE FINANCIAL INFORMATION IN OPEN

7    COURT, BUT WE HAVE HIS INFORMATION THAT SHOWS THE MANNER IN

8    WHICH WE WOULD ARGUE HE DID PROVIDE CONSENT TO WELLS FARGO TO

9    BE CONTACTED ON HIS CELL PHONE.  SO THERE IS A REAL QUESTION, I

10   THINK, ABOUT WHETHER MR. DUNMORE HIMSELF HAS STANDING, TO USE

11   MR. HALL'S TERMS.  I'M NOT SURE WHETHER HE WANTS TO OPT OUT OR

12   WHETHER HE WANTS TO OBJECT.  WE HAVE NO PROBLEM IF HE WANTS TO

13   TRY TO OPT OUT.

14             THE COURT:  LET ME SEE, I DON'T THINK HE ASKED TO OPT

15   OUT.

16             MR. LONERGAN:  OKAY.

17             THE COURT:  I DON'T SEE ANYTHING THAT INDICATES THAT

18   HE WANTED TO OPT OUT.  BUT MR. HALL -- AND I'M SORRY, I FORGOT

19   THE OTHER COUNSEL'S NAME, THEY'RE HERE REPRESENTING HIM.  SO

20   CERTAINLY IF THEY WISH TO OPT OUT, NOW IS THE TIME FOR THEM TO

21   SPEAK UP.

22             MR. WEAVER:  NO.

23             THE COURT:  MR. HALL?

24             MR. HALL:  YOUR HONOR, I HAVE NO INSTRUCTION FROM MY

25   CLIENT ONE WAY OR THE OTHER.  I CAN'T --

1        THE COURT:  SO AS BEST AS I CAN TELL, THEY DON'T WANT

2   TO OPT OUT.

3        MR. LONERGAN:  VERY WELL.  SO I ASSUME THEY'VE LOOKED

4   AT THEIR OWN FACTS ABOUT WHAT CONSENT WAS PROVIDED BY

5   MR. DUNMORE AND REACHED -- TAKEN THEIR OWN COUNSEL THAT THEY'RE

6   BETTER OFF IN THE CASE AND TO LITIGATE THE CLAIM ON THEIR OWN.

7   AND FROM WHAT INFORMATION I HAVE, THAT SEEMS TO BE A WISE

8   DECISION.

9        THE FINAL POINT I WOULD MAKE BRIEFLY, YOUR HONOR, BECAUSE

10  IT'S REALLY AN ISSUE IN WHICH MY CLIENT, WELLS FARGO, DOESN'T

11  HAVE A DIRECT INTEREST, AND THAT IS THE ISSUE OF ATTORNEYS'

12  FEES.

13       AS THE COURT KNOWS, PLAINTIFF'S COUNSEL INSISTED UPON A

14  NONREVERSIONARY SETTLEMENT.  SO THERE IS NO POSSIBILITY OF ANY

15  MONEY COMING BACK TO WELLS FARGO.  THEY WERE ADAMANT ABOUT

16  THAT.  SO WE DON'T HAVE A DOG IN THE FIGHT IF YOU WILL.  AND

17  THE APPROVAL OF THE SETTLEMENT BY YOUR HONOR IS SOLELY BASED

18  UPON THE ADEQUACY OF THE COMPENSATION OF CLASS MEMBERS.  IT

19  DOES NOT DEPEND UPON ANY PARTICULAR FEE AWARD.

20       BUT I WOULD MAKE THIS POINT:  AS COUNSEL HAVE ARGUED,

21  THERE ARE A VARIETY OF FACTORS THE COURT WOULD LOOK AT IN TERMS

22  OF DETERMINING REASONABLENESS OF FEES.  THE RESULT OBTAINED IS

23  ONE OF THEM, AND THERE HAS BEEN DISCUSSION ABOUT THAT THIS

24  MORNING.  BUT CERTAINLY ONE OF THEM IS THE RISK THAT CLASS

25  COUNSEL TOOK ON IN TAKING THIS CASE.  AND IT IS VERY CLEAR TO

1   WELLS FARGO, AND WE WOULD HOPE YOUR HONOR, THAT THESE CASES

2   PRESENT A HIGH RISK FROM THE PLAINTIFFS' STANDPOINT IN TERMS OF

3   THIS -- OF THE CASE LAW, DENYING CLASS CERTIFICATION, THE

4   INDIVIDUALIZED PROOF THAT WOULD HAVE TO BE PRESENTED AND

5   REVIEWED BY A TRIER OF FACT TO DETERMINE WHETHER THERE IS

6   LIABILITY, ALL OF WHICH WAS BORNE OUT BY THE SAMPLING AND THE

7   SHADES OF GRAY AND ALL THE DIFFERENT TYPES OF CONSENT.

8        SO WE BELIEVE, WELLS FARGO BELIEVES, IT WAS A VERY RISKY

9   CASE -- A VERY STRONG CASE FOR WELLS FARGO.  AND I'M CONFIDENT

10  THAT AT LEAST ON THAT FACTOR, THE RISKS OF THE CASE, THAT CLASS

11  COUNSEL HAVE A STRONG ARGUMENT TO MAKE IN TERMS OF WHY THE FEES

12  SOUGHT IS A REASONABLE ONE.  ALTHOUGH, AGAIN IT IS NOT OUR

13  ISSUE, YOUR HONOR.

14        THE COURT:  SO REFRESH MY RECOLLECTION.  ASSUME THAT

15  I REDUCE THE AMOUNT OF ATTORNEYS' FEES, WHATEVER THAT

16  DIFFERENCE MIGHT BE DOES NOT COME BACK TO WELLS FARGO; IT WILL

17  SIMPLY BE PASSED ON TO THE CLASS MEMBERS, CORRECT?

18        MR. LONERGAN:  THAT'S CORRECT, YOUR HONOR.  THERE IS

19  NO POSSIBILITY OF REVERSION TO WELLS FARGO.

20        THE COURT:  I'M NOT SAYING I'M GOING TO DO THAT, SO

21  DON'T PANIC, COUNSEL.  BUT AS YOU REMEMBER, WE HAD THIS

22  CONVERSATION LAST TIME AROUND, AND I TOLD YOU THAT, YOU KNOW --

23  MY MAIN INTEREST -- OF COURSE I KNOW THAT LAWYERS HAVE TO --

24  YOU KNOW, THEY'RE NOT SLAVES.  THEY DON'T WORK FOR FREE.  THEY

25  DO PROVIDE A GENUINE SERVICE FOR THEIR CLIENTS.  BUT MY MAIN

1   INTEREST, OF COURSE, IS TO PROTECT AND TO MAXIMIZE THE RETURN

2   TO THE CLASS MEMBERS WITHOUT DOING A DISSERVICE TO COUNSEL, WHO

3   HAVE PROVIDED A LEGITIMATE SERVICE.  SO, OKAY, IS THERE

4   ANYTHING ELSE?  I DO HAVE A TRIAL TO --

5            MR. CAMPION:  IF I COULD HAVE 30 SECONDS, YOUR HONOR,

6   A MATTER OF HOUSEKEEPING.

7            THE COURT:  YES.

8            MR. CAMPION:  DOUGLAS CAMPION.  THERE WERE 153 LATE

9   CLAIMS THAT WERE FILED AFTER THE CLAIM FILING DEADLINE.  IF

10  THOSE ARE INCLUDED, AND THEY WEREN'T FILED FOR A LOT OF

11  DIFFERENT REASONS, BY MILITARY THAT WERE COMING BACK FROM

12  AFGHANISTAN, ETC.

13           THE COURT:  THEY SHOULD BE ALLOWED, ESPECIALLY IF

14  THEY'RE IN THE MILITARY.

15           MR. CAMPION:  IT WAS A DIFFERENCE OF MAYBE 8 OR

16  9 CENTS PER CLAIM IF WE ADD THOSE PEOPLE.  WE WANTED TO GET

17  COURT APPROVAL TO DO THAT.

18           MR. LONERGAN:  NO OBJECTION.

19           THE COURT:  IT WILL BE APPROVED.

20           MR. CAMPION:  ONE OTHER ISSUE, THAT MR. HALL SAID

21  PLAINTIFFS USUALLY PAY THAT, AND WE'RE PASSING THE FEES ON

22  THROUGH THE CLAIM ADMINISTRATION.  HE IS TALKING ABOUT

23  NON-REVERSIONARY CASES, YOUR HONOR.  WHEN WE HAVE A -- HE'S

24  TALKING ABOUT REVERSIONARY CASES.

25           THE COURT:  REVERSIONARY.

1          MR. CAMPION:  AND THE NON-REVERSIONARY CASE, THE

2     CLAIMS ADMINISTRATION ALWAYS COMES OUT AS A PERCENTAGE OF THE

3     COMMON FUND.  IT'S ALWAYS COMING OUT OF THE COMMON FUND.  WE'RE

4     DOING NOTHING UNUSUAL IN ASKING FOR OUR FEES BASED ON THE

5     COMMON FUND AND TAKING THE ADMINISTRATION COSTS OUT OF THERE.

6          THE COURT:  ALL RIGHT.  THE MATTER IS TAKEN UNDER

7     SUBMISSION.  THANK YOU.

8          MR. CAMPION:  THANK YOU.

9          MR. LONERGAN:  THANK YOU VERY MUCH, YOUR HONOR.

10                    (RECESS AT 10:08 A.M.)

11                         ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C-E-R-T-I-F-I-C-A-T-I-O-N

2          I HEREBY CERTIFY THAT I AM A DULY APPOINTED,

3   QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED

4   STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT

5   TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;

6   THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY

7   STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES

8   WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL

9   CONFERENCE.

10          DATED:  AUGUST 26, 2013, AT SAN DIEGO, CALIFORNIA

11

12                    _____

13                    S/DEBORAH M. O'CONNELL, CSR #10563
                      REGISTERED PROFESSIONAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25